(Slip Opinion)          OCTOBER TERM, 2017          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GILL ET AL. *v.* WHITFORD ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN

No. 16–1161.   Argued October 3, 2017—Decided June 18, 2018

Members of the Wisconsin Legislature are elected from single-member legislative districts.  Under the Wisconsin Constitution, the legislature must redraw the boundaries of those districts following each census.  After the 2010 census, the legislature passed a new districting plan known as Act 43.  Twelve Democratic voters, the plaintiffs in this case, alleged that Act 43 harms the Democratic Party's ability to convert Democratic votes into Democratic seats in the legislature. They asserted that Act 43 does this by "cracking" certain Democratic voters among different districts in which those voters fail to achieve electoral majorities and "packing" other Democratic voters in a few districts in which Democratic candidates win by large margins.  The plaintiffs argued that the degree to which packing and cracking has favored one political party over another can be measured by an "efficiency gap" that compares each party's respective "wasted" votes— *i.e.*, votes cast for a losing candidate or for a winning candidate in excess of what that candidate needs to win—across all legislative districts.  The plaintiffs claimed that the statewide enforcement of Act 43 generated an excess of wasted Democratic votes, thereby violating the plaintiffs' First Amendment right of association and their Fourteenth Amendment right to equal protection.  The defendants, several members of the state election commission, moved to dismiss the plaintiffs' claims.  They argued that the plaintiffs lacked standing to challenge the constitutionality of Act 43 as a whole because, as individual voters, their legally protected interests extend only to the makeup of the legislative district in which they vote.  The three-judge District Court denied the defendants' motion and, following a trial, concluded that Act 43 was an unconstitutional partisan gerrymander. Regarding standing, the court held that the plaintiffs had suffered a

particularized injury to their equal protection rights.

*Held*: The plaintiffs have failed to demonstrate Article III standing. Pp. 8–22.

(a) Over the past five decades this Court has repeatedly been asked to decide what judicially enforceable limits, if any, the Constitution sets on partisan gerrymandering. Previous attempts at an answer have left few clear landmarks for addressing the question and have generated conflicting views both of how to conceive of the injury arising from partisan gerrymandering and of the appropriate role for the Federal Judiciary in remedying that injury. See *Gaffney* v. *Cummings,* 412 U. S. 735, *Davis* v. *Bandemer,* 478 U. S. 109, *Vieth* v. *Jubelirer,* 541 U. S. 267, and *League of United Latin American Citizens* v. *Perry,* 548 U. S. 399. Pp. 8–12.

(b) A plaintiff may not invoke federal-court jurisdiction unless he can show "a personal stake in the outcome of the controversy," *Baker* v. *Carr*, 369 U. S. 186, 204. That requirement ensures that federal courts "exercise power that is judicial in nature," *Lance* v. *Coffman*, 549 U. S. 437, 439, 441. To meet that requirement, a plaintiff must show an injury in fact—his pleading and proof that he has suffered the "invasion of a legally protected interest" that is "concrete and particularized," *i.e.*, which "affect[s] the plaintiff in a personal and individual way." *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560, and n. 1.

The right to vote is "individual and personal in nature," *Reynolds* v. *Sims,* 377 U. S. 533, 561, and "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage, *Baker*, 369 U. S., at 206. The plaintiffs here alleged that they suffered such injury from partisan gerrymandering, which works through the "cracking" and "packing" of voters. To the extent that the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific. An individual voter in Wisconsin is placed in a single district. He votes for a single representative. The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked. A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, "assert[s] only a generalized grievance against governmental conduct of which he or she does not approve." *United States* v. *Hays*, 515 U. S. 737, 745.

The plaintiffs argue that their claim, like the claims presented in *Baker* and *Reynolds*, is statewide in nature. But the holdings in those cases were expressly premised on the understanding that the injuries giving rise to those claims were "individual and personal in nature," *Reynolds*, 377 U. S., at 561, because the claims were brought by voters who alleged "facts showing disadvantage to themselves as

individuals," *Baker*, 369 U. S., at 206. The plaintiffs' mistaken insistence that the claims in *Baker* and *Reynolds* were "statewide in nature" rests on a failure to distinguish injury from remedy. In those malapportionment cases, the only way to vindicate an individual plaintiff's right to an equally weighted vote was through a wholesale "restructuring of the geographical distribution of seats in a state legislature." *Reynolds*, 377 U. S., at 561. Here, the plaintiffs' claims turn on allegations that their votes have been diluted. Because that harm arises from the particular composition of the voter's own district, remedying the harm does not necessarily require restructuring all of the State's legislative districts. It requires revising only such districts as are necessary to reshape the voter's district. This fits the rule that a "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U. S. 343, 357.

The plaintiffs argue that their legal injury also extends to the statewide harm to their interest "in their collective representation in the legislature," and in influencing the legislature's overall "composition and policymaking." Brief for Appellees 31. To date, however, the Court has not found that this presents an individual and personal injury of the kind required for Article III standing. A citizen's interest in the overall composition of the legislature is embodied in his right to vote for his representative. The harm asserted by the plaintiffs in this case is best understood as arising from a burden on their own votes. Pp. 12–17.

(c) Four of the plaintiffs in this case pleaded such a particularized burden. But as their case progressed to trial, they failed to pursue their allegations of individual harm. They instead rested their case on their theory of statewide injury to Wisconsin Democrats, in support of which they offered three kinds of evidence. First, they presented testimony pointing to the lead plaintiff's hope of achieving a Democratic majority in the legislature. Under the Court's cases to date, that is a collective political interest, not an individual legal interest. Second, they produced evidence regarding the mapmakers' deliberations as they drew district lines. The District Court relied on this evidence in concluding that those mapmakers sought to understand the partisan effect of the maps they were drawing. But the plaintiffs' establishment of injury in fact turns on effect, not intent, and requires a showing of a burden on the plaintiffs' votes that is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Defenders of Wildlife*, 504 U. S., at 560. Third, the plaintiffs presented partisan-asymmetry studies showing that Act 43 had skewed Wisconsin's statewide map in favor of Republicans. Those studies do not address the effect that a gerrymander has on the votes of particular citizens.

They measure instead the effect that a gerrymander has on the for-
tunes of political parties.  That shortcoming confirms the fundamen-
tal problem with the plaintiffs' case as presented on this record.  It is
a case about group political interests, not individual legal rights.
Pp. 17–21.

   (d) Where a plaintiff has failed to demonstrate standing, this Court
usually directs dismissal.  See, *e.g.*, *DaimlerChrysler Corp.* v. *Cuno,*
547 U. S. 332, 354.  Here, however, where the case concerns an un-
settled kind of claim that the Court has not agreed upon, the con-
tours and justiciability of which are unresolved, the case is remanded
to the District Court to give the plaintiffs an opportunity to prove
concrete and particularized injuries using evidence that would tend
to demonstrate a burden on their individual votes.  Cf. *Alabama Leg-
islative Black Caucus* v. *Alabama*, 575 U. S. ___, ___.  Pp. 21–22.

218 F. Supp. 3d 837, vacated and remanded.

   ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY,
GINSBURG, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined, and in
which THOMAS and GORSUCH, JJ., joined except as to Part III.  KAGAN,
J., filed a concurring opinion, in which GINSBURG, BREYER, and SO-
TOMAYOR, JJ., joined.  THOMAS, J., filed an opinion concurring in part
and concurring in the judgment, in which GORSUCH, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1161

_____

## BEVERLY R. GILL, ET AL., APPELLANTS *v.* WILLIAM WHITFORD, ET AL.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN

[June 18, 2018]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The State of Wisconsin, like most other States, entrusts to its legislature the periodic task of redrawing the boundaries of the State's legislative districts. A group of Wisconsin Democratic voters filed a complaint in the District Court, alleging that the legislature carried out this task with an eye to diminishing the ability of Wisconsin Democrats to convert Democratic votes into Democratic seats in the legislature. The plaintiffs asserted that, in so doing, the legislature had infringed their rights under the First and Fourteenth Amendments.

But a plaintiff seeking relief in federal court must first demonstrate that he has standing to do so, including that he has "a personal stake in the outcome," *Baker* v. *Carr*, 369 U. S. 186, 204 (1962), distinct from a "generally available grievance about government," *Lance* v. *Coffman*, 549 U. S. 437, 439 (2007) (*per curiam*). That threshold requirement "ensures that we act *as judges*, and do not engage in policymaking properly left to elected representatives." *Hollingsworth* v. *Perry*, 570 U. S. 693, 700 (2013).

Certain of the plaintiffs before us alleged that they had such a personal stake in this case, but never followed up with the requisite proof. The District Court and this Court therefore lack the power to resolve their claims. We vacate the judgment and remand the case for further proceedings, in the course of which those plaintiffs may attempt to demonstrate standing in accord with the analysis in this opinion.

I

Wisconsin's Legislature consists of a State Assembly and a State Senate. Wis. Const., Art. IV, §1. The 99 members of the Assembly are chosen from single districts that must "consist of contiguous territory and be in as compact form as practicable." §4. State senators are likewise chosen from single-member districts, which are laid on top of the State Assembly districts so that three Assembly districts form one Senate district. See §5; Wis. Stat. §4.001 (2011).

The Wisconsin Constitution gives the legislature the responsibility to "apportion and district anew the members of the senate and assembly" at the first session following each census. Art. IV, §3. In recent decades, however, that responsibility has just as often been taken up by federal courts. Following the census in 1980, 1990, and 2000, federal courts drew the State's legislative districts when the Legislature and the Governor—split on party lines—were unable to agree on new districting plans. The Legislature has broken the logjam just twice in the last 40 years. In 1983, a Democratic Legislature passed, and a Democratic Governor signed, a new districting plan that remained in effect until the 1990 census. See 1983 Wis. Laws ch. 4. In 2011, a Republican Legislature passed, and a Republican Governor signed, the districting plan at issue here, known as Act 43. See Wis. Stat. §§ 4.009, 4.01–4.99; 2011 Wis. Laws ch. 4. Following the passage of Act 43,

Republicans won majorities in the State Assembly in the 2012 and 2014 elections. In 2012, Republicans won 60 Assembly seats with 48.6% of the two-party statewide vote for Assembly candidates. In 2014, Republicans won 63 Assembly seats with 52% of the statewide vote. 218 F. Supp. 3d 837, 853 (WD Wis. 2016).

In July 2015, twelve Wisconsin voters filed a complaint in the Western District of Wisconsin challenging Act 43. The plaintiffs identified themselves as "supporters of the public policies espoused by the Democratic Party and of Democratic Party candidates." 1 App. 32, Complaint ¶15. They alleged that Act 43 is a partisan gerrymander that "unfairly favor[s] Republican voters and candidates," and that it does so by "cracking" and "packing" Democratic voters around Wisconsin. *Id.,* at 28–30, ¶¶5–7. As they explained:

> "Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Packing means concentrating one party's backers in a few districts that they win by overwhelming margins." *Id.,* at 29, ¶5.

Four of the plaintiffs—Mary Lynne Donohue, Wendy Sue Johnson, Janet Mitchell, and Jerome Wallace—alleged that they lived in State Assembly districts where Democrats have been cracked or packed. *Id.*, at 34–36, ¶¶20, 23, 24, 26; see *id.,* at 50–53, ¶¶60–70 (describing packing and cracking in Assembly Districts 22, 26, 66, and 91). All of the plaintiffs also alleged that, regardless of "whether they themselves reside in a district that has been packed or cracked," they have been "harmed by the manipulation of district boundaries" because Democrats statewide "do not have the same opportunity provided to Republicans to elect representatives of their choice to the Assembly." *Id.,* at 33, ¶16.

The plaintiffs argued that, on a statewide level, the

degree to which packing and cracking has favored one party over another can be measured by a single calculation: an "efficiency gap" that compares each party's respective "wasted" votes across all legislative districts. "Wasted" votes are those cast for a losing candidate or for a winning candidate in excess of what that candidate needs to win. *Id.,* at 28–29, ¶5. The plaintiffs alleged that Act 43 resulted in an unusually large efficiency gap that favored Republicans. *Id.,* at 30, ¶7. They also submitted a "Demonstration Plan" that, they asserted, met all of the legal criteria for apportionment, but was at the same time "almost perfectly balanced in its partisan consequences." *Id.,* at 31, ¶10. They argued that because Act 43 generated a large and unnecessary efficiency gap in favor of Republicans, it violated the First Amendment right of association of Wisconsin Democratic voters and their Fourteenth Amendment right to equal protection. The plaintiffs named several members of the state election commission as defendants in the action. *Id.,* at 36, ¶¶28–30.

The election officials moved to dismiss the complaint. They argued, among other things, that the plaintiffs lacked standing to challenge the constitutionality of Act 43 as a whole because, as individual voters, their legally protected interests extend only to the makeup of the legislative districts in which they vote. A three-judge panel of the District Court, see 28 U. S. C. §2284(a), denied the defendants' motion. In the District Court's view, the plaintiffs "identif[ied] their injury as not simply their inability to elect a representative in their own districts, but also their reduced opportunity to be represented by Democratic legislators across the state." *Whitford* v. *Nichol*, 151 F. Supp. 3d 918, 924 (WD Wis. 2015). It therefore followed, in the District Court's opinion, that "[b]ecause plaintiffs' alleged injury in this case relates to their statewide representation, . . . they should be permitted to bring a statewide claim." *Id.,* at 926.

The case proceeded to trial, where the plaintiffs presented testimony from four fact witnesses. The first was lead plaintiff William Whitford, a retired law professor at the University of Wisconsin in Madison. Whitford testified that he lives in Madison in the 76th Assembly District, and acknowledged on cross-examination that this is, under any plausible circumstances, a heavily Democratic district. Under Act 43, the Democratic share of the Assembly vote in Whitford's district is 81.9%; under the plaintiffs' ideal map—their Demonstration Plan—the projected Democratic share of the Assembly vote in Whitford's district would be 82%. 147 Record 35–36. Whitford therefore conceded that Act 43 had not "affected [his] ability to vote for and elect a Democrat in [his] district." *Id.,* at 37. Whitford testified that he had nevertheless suffered a harm "relate[d] to [his] ability to engage in campaign activity to achieve a majority in the Assembly and the Senate." *Ibid.* As he explained, "[t]he only practical way to accomplish my policy objectives is to get a majority of the Democrats in the Assembly and the Senate ideally in order to get the legislative product I prefer." *Id.,* at 33.

The plaintiffs also presented the testimony of legislative aides Adam Foltz and Tad Ottman, as well as that of Professor Ronald Gaddie, a political scientist who helped design the Act 43 districting map, regarding how that map was designed and adopted. In particular, Professor Gaddie testified about his creation of what he and the District Court called "S curves": color-coded tables of the estimated partisan skew of different draft redistricting maps. See 218 F. Supp. 3d, at 850, 858. The colors corresponded with assessments regarding whether different districts tilted Republican or Democratic under various statewide political scenarios. The S curve for the map that was eventually adopted projected that "Republicans would maintain a majority under any likely voting scenario,"

with Democrats needing 54% of the statewide vote to secure a majority in the legislature. *Id.,* at 852.

Finally, the parties presented testimony from four expert witnesses. The plaintiffs' experts, Professor Kenneth Mayer and Professor Simon Jackman, opined that—according to their efficiency-gap analyses—the Act 43 map would systematically favor Republicans for the duration of the decade. See *id.,* at 859–861. The defendants' experts, Professor Nicholas Goedert and Sean Trende, opined that efficiency gaps alone are unreliable measures of durable partisan advantage, and that the political geography of Wisconsin currently favors Republicans because Democrats—who tend to be clustered in large cities—are inefficiently distributed in many parts of Wisconsin for purposes of winning elections. See *id.,* at 861–862.

At the close of evidence, the District Court concluded—over the dissent of Judge Griesbach—that the plaintiffs had proved a violation of the First and Fourteenth Amendments. The court set out a three-part test for identifying unconstitutional gerrymanders: A redistricting map violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment if it "(1) is intended to place a severe impediment on the effectiveness of the votes of individual citizens on the basis of their political affiliation, (2) has that effect, and (3) cannot be justified on other, legitimate legislative grounds." *Id.,* at 884.

The court went on to find, based on evidence concerning the manner in which Act 43 had been adopted, that "one of the purposes of Act 43 was to secure Republican control of the Assembly under any likely future electoral scenario for the remainder of the decade." *Id.,* at 896. It also found that the "more efficient distribution of Republican voters has allowed the Republican Party to translate its votes into seats with significantly greater ease and to achieve—and preserve—control of the Wisconsin legislature." *Id.,*

at 905. As to the third prong of its test, the District Court concluded that the burdens the Act 43 map imposed on Democrats could not be explained by "legitimate state prerogatives [or] neutral factors." *Id.,* at 911. The court recognized that "Wisconsin's political geography, particularly the high concentration of Democratic voters in urban centers like Milwaukee and Madison, affords the Republican Party a natural, but modest, advantage in the districting process," but found that this inherent geographic disparity did not account for the magnitude of the Republican advantage. *Id.,* at 921, 924.

Regarding standing, the court held that the plaintiffs had a "cognizable equal protection right against state-imposed barriers on [their] ability to vote effectively for the party of [their] choice." *Id.,* at 928. It concluded that Act 43 "prevent[ed] Wisconsin Democrats from being able to translate their votes into seats as effectively as Wisconsin Republicans," and that "Wisconsin Democrats, therefore, have suffered a personal injury to their Equal Protection rights." *Ibid.* The court turned away the defendants' argument that the plaintiffs' injury was not sufficiently particularized by finding that "[t]he harm that the plaintiffs have experienced . . . is one shared by Democratic voters in the State of Wisconsin. The dilution of their votes is both personal and acute." *Id.,* at 930.

Judge Griesbach dissented. He wrote that, under this Court's existing precedents, "partisan intent" to benefit one party rather than the other in districting "is not illegal, but is simply the consequence of assigning the task of redistricting to the political branches." *Id.,* at 939. He observed that the plaintiffs had not attempted to prove that "specific districts . . . had been gerrymandered," but rather had "relied on statewide data and calculations." *Ibid.* And he argued that the plaintiffs' proof, resting as it did on statewide data, had "no relevance to any gerrymandering injury alleged by a voter in a single district." *Id.,* at

952. On that basis, Judge Griesbach would have entered judgment for the defendants.

The District Court enjoined the defendants from using the Act 43 map in future elections and ordered them to have a remedial districting plan in place no later than November 1, 2017. The defendants appealed directly to this Court, as provided under 28 U. S. C. §1253. We stayed the District Court's judgment and postponed consideration of our jurisdiction. 582 U. S. ___ (2017).

## II
## A

Over the past five decades this Court has been repeatedly asked to decide what judicially enforceable limits, if any, the Constitution sets on the gerrymandering of voters along partisan lines. Our previous attempts at an answer have left few clear landmarks for addressing the question. What our precedents have to say on the topic is, however, instructive as to the myriad competing considerations that partisan gerrymandering claims involve. Our efforts to sort through those considerations have generated conflicting views both of how to conceive of the injury arising from partisan gerrymandering and of the appropriate role for the Federal Judiciary in remedying that injury.

Our first consideration of a partisan gerrymandering claim came in *Gaffney* v. *Cummings*, 412 U. S. 735 (1973). There a group of plaintiffs challenged the constitutionality of a Connecticut redistricting plan that "consciously and overtly adopted and followed a policy of 'political fairness,' which aimed at a rough scheme of proportional representation of the two major political parties." *Id.,* at 738. To that end, the redistricting plan broke up numerous towns, "wiggl[ing] and joggl[ing]" district boundary lines in order to "ferret out pockets of each party's strength." *Id.,* at 738, and n. 3, 752, n. 18. The plaintiffs argued that, notwithstanding the rough population equality of the districts, the

plan was unconstitutional because its consciously political design was "nothing less than a gigantic political gerrymander." *Id.,* at 752. This Court rejected that claim. We reasoned that it would be "idle" to hold that "any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it," because districting "inevitably has and is intended to have substantial political consequences." *Id.,* at 752–753.

Thirteen years later came *Davis* v. *Bandemer*, 478 U. S. 109 (1986). Unlike the bipartisan gerrymander at issue in *Gaffney*, the allegation in *Bandemer* was that Indiana Republicans had gerrymandered Indiana's legislative districts "to favor Republican incumbents and candidates and to disadvantage Democratic voters" through what the plaintiffs called the "stacking" (packing) and "splitting" (cracking) of Democrats. 478 U. S., at 116–117 (plurality opinion). A majority of the Court agreed that the case before it was justiciable. *Id.,* at 125, 127. The Court could not, however, settle on a standard for what constitutes an unconstitutional partisan gerrymander.

Four Justices would have required the *Bandemer* plaintiffs to "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Id.,* at 127. In that plurality's view, the plaintiffs had failed to make a sufficient showing on the latter point because their evidence of unfavorable election results for Democrats was limited to a single election cycle. See *id.,* at 135.

Three Justices, concurring in the judgment, would have held that the "Equal Protection Clause does not supply judicially manageable standards for resolving purely political gerrymandering claims." *Id.,* at 147 (opinion of O'Connor, J.). Justice O'Connor took issue, in particular, with the plurality's focus on factual questions concerning "statewide electoral success." *Id.,* at 158. She warned that allowing district courts to "strike down apportion-

ment plans on the basis of their prognostications as to the outcome of future elections or future apportionments invites 'findings' on matters as to which neither judges nor anyone else can have any confidence." *Id.,* at 160.

Justice Powell, joined by Justice Stevens, concurred in part and dissented in part. In his view, the plaintiffs' claim was not simply that their "voting strength was diluted statewide," but rather that "certain key districts were grotesquely gerrymandered to enhance the election prospects of Republican candidates." *Id.,* at 162, 169. Thus, he would have focused on the question "whether the boundaries of the voting districts have been distorted deliberately and arbitrarily to achieve illegitimate ends." *Id.,* at 165.

Eighteen years later, we revisited the issue in *Vieth* v. *Jubelirer*, 541 U. S. 267 (2004). In that case the plaintiffs argued that Pennsylvania's Legislature had created "meandering and irregular" congressional districts that "ignored all traditional redistricting criteria, including the preservation of local government boundaries," in order to provide an advantage to Republican candidates for Congress. *Id.,* at 272–273 (plurality opinion) (brackets omitted).

The *Vieth* Court broke down on numerous lines. Writing for a four-Justice plurality, Justice Scalia would have held that the plaintiffs' claims were nonjusticiable because there was no "judicially discernible and manageable standard" by which to decide them. *Id.,* at 306. On those grounds, the plurality affirmed the dismissal of the claims. *Ibid.* JUSTICE KENNEDY concurred in the judgment. He noted that "there are yet no agreed upon substantive principles of fairness in districting," and that, consequently, "we have no basis on which to define clear, manageable, and politically neutral standards for measuring the particular burden" on constitutional rights. *Id.,* at 307–308. He rejected the principle advanced by the plaintiffs—that

"a majority of voters in [Pennsylvania] should be able to elect a majority of [Pennsylvania's] congressional delegation"—as a "precept" for which there is "no authority." *Id.,* at 308. Yet JUSTICE KENNEDY recognized the possibility that "in another case a standard might emerge that suitably demonstrates how an apportionment's *de facto* incorporation of partisan classifications burdens" representational rights. *Id.,* at 312.

Four Justices dissented in three different opinions. Justice Stevens would have permitted the plaintiffs' claims to proceed on a district-by-district basis, using a legal standard similar to the standard for racial gerrymandering set forth in *Shaw* v. *Hunt*, 517 U. S. 899 (1996). See 541 U. S., at 335–336, 339. Under this standard, any district with a "bizarre shape" for which the only possible explanation was "a naked desire to increase partisan strength" would be found unconstitutional under the Equal Protection Clause. *Id.,* at 339. Justice Souter, joined by JUSTICE GINSBURG, agreed that a plaintiff alleging unconstitutional partisan gerrymandering should proceed on a district-by-district basis, as "we would be able to call more readily on some existing law when we defined what is suspect at the district level." See *id.,* at 346–347.

JUSTICE BREYER dissented on still other grounds. In his view, the drawing of single-member legislative districts—even according to traditional criteria—is "rarely . . . politically neutral." *Id.,* at 359. He therefore would have distinguished between gerrymandering for passing political advantage and gerrymandering leading to the "unjustified entrenchment" of a political party. *Id.,* at 360–361.

The Court last took up this question in *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399 (2006) (*LULAC*). The plaintiffs there challenged a mid-decade redistricting map passed by the Texas Legislature. As in *Vieth*, a majority of the Court could find no justiciable standard by which to resolve the plaintiffs' partisan ger-

rymandering claims. Relevant to this case, an *amicus* brief in support of the *LULAC* plaintiffs proposed a "symmetry standard" to "measure partisan bias" by comparing how the two major political parties "would fare hypothetically if they each . . . received a given percentage of the vote." 548 U. S., at 419 (opinion of KENNEDY, J.). JUSTICE KENNEDY noted some wariness at the prospect of "adopting a constitutional standard that invalidates a map based on unfair results that would occur in a hypothetical state of affairs." *Id.,* at 420. Aside from that problem, he wrote, the partisan bias standard shed no light on "how much partisan dominance is too much." *Ibid.* JUSTICE KENNEDY therefore concluded that "asymmetry alone is not a reliable measure of unconstitutional partisanship." *Ibid.*

Justice Stevens would have found that the Texas map was a partisan gerrymander based in part on the asymmetric advantage it conferred on Republicans in converting votes to seats. *Id.,* at 466–467, 471–473 (opinion concurring in part and dissenting in part). Justice Souter, writing for himself and JUSTICE GINSBURG, noted that he would not "rule out the utility of a criterion of symmetry," and that "further attention could be devoted to the administrability of such a criterion at all levels of redistricting and its review." *Id.,* at 483–484 (opinion concurring in part and dissenting in part).

## B

At argument on appeal in this case, counsel for the plaintiffs argued that this Court *can* address the problem of partisan gerrymandering because it *must*: The Court should exercise its power here because it is the "only institution in the United States" capable of "solv[ing] this problem." Tr. of Oral Arg. 62. Such invitations must be answered with care. "Failure of political will does not justify unconstitutional remedies." *Clinton* v. *City of New*

*York*, 524 U. S. 417, 449 (1998) (KENNEDY, J., concurring). Our power as judges to "say what the law is," *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803), rests not on the default of politically accountable officers, but is instead grounded in and limited by the necessity of resolving, according to legal principles, a plaintiff's particular claim of legal right.

Our considerable efforts in *Gaffney*, *Bandemer*, *Vieth*, and *LULAC* leave unresolved whether such claims may be brought in cases involving allegations of partisan gerrymandering. In particular, two threshold questions remain: what is necessary to show standing in a case of this sort, and whether those claims are justiciable. Here we do not decide the latter question because the plaintiffs in this case have not shown standing under the theory upon which they based their claims for relief.

To ensure that the Federal Judiciary respects "the proper—and properly limited—role of the courts in a democratic society," *Allen* v. *Wright*, 468 U. S. 737, 750 (1984), a plaintiff may not invoke federal-court jurisdiction unless he can show "a personal stake in the outcome of the controversy." *Baker*, 369 U. S., at 204. A federal court is not "a forum for generalized grievances," and the requirement of such a personal stake "ensures that courts exercise power that is judicial in nature." *Lance*, 549 U. S., at 439, 441. We enforce that requirement by insisting that a plaintiff satisfy the familiar three-part test for Article III standing: that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 6). Foremost among these requirements is injury in fact—a plaintiff's pleading and proof that he has suffered the "invasion of a legally protected interest" that is "concrete and particularized," *i.e.*, which "affect[s] the plaintiff in a personal and individual way." *Lujan* v.

*Defenders of Wildlife*, 504 U. S. 555, 560, and n. 1 (1992).

We have long recognized that a person's right to vote is "individual and personal in nature." *Reynolds* v. *Sims*, 377 U. S. 533, 561 (1964). Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Baker*, 369 U. S., at 206. The plaintiffs in this case alleged that they suffered such injury from partisan gerrymandering, which works through "packing" and "cracking" voters of one party to disadvantage those voters. 1 App. 28–29, 32–33, Complaint ¶¶5, 15. That is, the plaintiffs claim a constitutional right not to be placed in legislative districts deliberately designed to "waste" their votes in elections where their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking). *Id.,* at 32–33, ¶15.

To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific. An individual voter in Wisconsin is placed in a single district. He votes for a single representative. The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked. This "disadvantage to [the voter] as [an] individual[]," *Baker*, 369 U. S., at 206, therefore results from the boundaries of the particular district in which he resides. And a plaintiff's remedy must be "limited to the inadequacy that produced [his] injury in fact." *Lewis* v. *Casey*, 518 U. S. 343, 357 (1996). In this case the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district.

For similar reasons, we have held that a plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered. See *United States* v. *Hays*, 515 U. S. 737, 744–745 (1995). A plaintiff who complains of gerrymandering, but

who does not live in a gerrymandered district, "assert[s] only a generalized grievance against governmental conduct of which he or she does not approve." *Id.,* at 745. Plaintiffs who complain of racial gerrymandering in their State cannot sue to invalidate the whole State's legislative districting map; such complaints must proceed "district-by-district." *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 6).

The plaintiffs argue that their claim of statewide injury is analogous to the claims presented in *Baker* and *Reynolds*, which they assert were "statewide in nature" because they rested on allegations that "districts *throughout a state* [had] been malapportioned." Brief for Appellees 29. But, as we have already noted, the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were "individual and personal in nature," *Reynolds*, 377 U. S., at 561, because the claims were brought by voters who alleged "facts showing disadvantage to themselves as individuals," *Baker*, 369 U. S., at 206.

The plaintiffs' mistaken insistence that the claims in *Baker* and *Reynolds* were "statewide in nature" rests on a failure to distinguish injury from remedy. In those malapportionment cases, the only way to vindicate an individual plaintiff's right to an equally weighted vote was through a wholesale "restructuring of the geographical distribution of seats in a state legislature." *Reynolds*, 377 U. S., at 561; see, *e.g., Moss* v. *Burkhart*, 220 F. Supp. 149, 156–160 (WD Okla. 1963) (directing the county-by-county reapportionment of the Oklahoma Legislature), aff'd *sub nom. Williams* v. *Moss*, 378 U. S. 558 (1964) (*per curiam*).

Here, the plaintiffs' partisan gerrymandering claims turn on allegations that their votes have been diluted. That harm arises from the particular composition of the voter's own district, which causes his vote—having been

packed or cracked—to carry less weight than it would
carry in another, hypothetical district. Remedying the
individual voter's harm, therefore, does not necessarily
require restructuring all of the State's legislative districts.
It requires revising only such districts as are necessary to
reshape the voter's district—so that the voter may be
unpacked or uncracked, as the case may be. Cf. *Alabama
Legislative Black Caucus*, 575 U. S., at ___ (slip op., at 7).
This fits the rule that a "remedy must of course be limited
to the inadequacy that produced the injury in fact that the
plaintiff has established." *Lewis*, 518 U. S., at 357.

The plaintiffs argue that their legal injury is not limited
to the injury that they have suffered as individual voters,
but extends also to the statewide harm to their interest "in
their collective representation in the legislature," and in
influencing the legislature's overall "composition and
policymaking." Brief for Appellees 31. But our cases to
date have not found that this presents an individual and
personal injury of the kind required for Article III stand-
ing. On the facts of this case, the plaintiffs may not rely
on "the kind of undifferentiated, generalized grievance
about the conduct of government that we have refused to
countenance in the past." *Lance*, 549 U. S., at 442. A
citizen's interest in the overall composition of the legisla-
ture is embodied in his right to vote for his representative.
And the citizen's abstract interest in policies adopted by
the legislature on the facts here is a nonjusticiable "gen-
eral interest common to all members of the public."
*Ex parte Lévitt*, 302 U. S. 633, 634 (1937) (*per curiam*).

We leave for another day consideration of other possible
theories of harm not presented here and whether those
theories might present justiciable claims giving rise to
statewide remedies. JUSTICE KAGAN'S concurring opinion
endeavors to address "other kinds of constitutional harm,"
see *post,* at 8, perhaps involving different kinds of plain-
tiffs, see *post,* at 9, and differently alleged burdens, see

*ibid.* But the opinion of the Court rests on the understanding that we lack jurisdiction to decide this case, much less to draw speculative and advisory conclusions regarding others. See *Public Workers* v. *Mitchell*, 330 U. S. 75, 90 (1947) (noting that courts must "respect the limits of [their] unique authority" and engage in "[j]udicial exposition . . . only when necessary to decide definite issues between litigants"). The reasoning of this Court with respect to the disposition of this case is set forth in this opinion and none other. And the sum of the standing principles articulated here, as applied to this case, is that the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes. In this gerrymandering context that burden arises through a voter's placement in a "cracked" or "packed" district.

## C

Four of the plaintiffs in this case—Mary Lynne Donohue, Wendy Sue Johnson, Janet Mitchell, and Jerome Wallace—pleaded a particularized burden along such lines. They alleged that Act 43 had "dilut[ed] the influence" of their votes as a result of packing or cracking in their legislative districts. See 1 App. 34–36, Complaint ¶¶20, 23, 24, 26. The facts necessary to establish standing, however, must not only be alleged at the pleading stage, but also proved at trial. See *Defenders of Wildlife*, 504 U. S., at 561. As the proceedings in the District Court progressed to trial, the plaintiffs failed to meaningfully pursue their allegations of individual harm. The plaintiffs did not seek to show such requisite harm since, on this record, it appears that not a single plaintiff sought to prove that he or she lives in a cracked or packed district. They instead rested their case at trial—and their arguments before this Court—on their theory of statewide injury to Wisconsin Democrats, in support of which they offered three kinds of evidence.

First, the plaintiffs presented the testimony of the lead plaintiff, Professor Whitford. But Whitford's testimony does not support any claim of packing or cracking of himself as a voter. Indeed, Whitford expressly acknowledged that Act 43 did not affect the weight of his vote. 147 Record 37. His testimony points merely to his hope of achieving a Democratic majority in the legislature—what the plaintiffs describe here as their shared interest in the composition of "the legislature as a whole." Brief for Appellees 32. Under our cases to date, that is a collective political interest, not an individual legal interest, and the Court must be cautious that it does not become "a forum for generalized grievances." *Lance*, 549 U. S., at 439, 441.

Second, the plaintiffs provided evidence regarding the mapmakers' deliberations as they drew district lines. As the District Court recounted, the plaintiffs' evidence showed that the mapmakers "test[ed] the partisan makeup and performance of districts as they might be configured in different ways." 218 F. Supp. 3d, at 891. Each of the mapmakers' alternative configurations came with a table that listed the number of "Safe" and "Lean" seats for each party, as well as "Swing" seats. *Ibid.* The mapmakers also labeled certain districts as ones in which "GOP seats [would be] strengthened a lot," *id.,* at 893; 2 App. 344, or which would result in "Statistical Pick Ups" for Republicans. 218 F. Supp. 3d, at 893 (alterations omitted). And they identified still other districts in which "GOP seats [would be] strengthened a little," "weakened a little," or were "likely lost." *Ibid.*

The District Court relied upon this evidence in concluding that, "from the outset of the redistricting process, the drafters sought to understand the partisan effect of the maps they were drawing." *Id.,* at 895. That evidence may well be pertinent with respect to any ultimate determination whether the plaintiffs may prevail in their claims against the defendants, assuming such claims present a

justiciable controversy. But the question at this point is whether the plaintiffs have established injury in fact. That turns on effect, not intent, and requires a showing of a burden on the plaintiffs' votes that is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Defenders of Wildlife*, 504 U. S., at 560.

Third, the plaintiffs offered evidence concerning the impact that Act 43 had in skewing Wisconsin's statewide political map in favor of Republicans. This evidence, which made up the heart of the plaintiffs' case, was derived from partisan-asymmetry studies similar to those discussed in *LULAC*. The plaintiffs contend that these studies measure deviations from "partisan symmetry," which they describe as the "social scientific tenet that [districting] maps should treat parties symmetrically." Brief for Appellees 37. In the District Court, the plaintiffs' case rested largely on a particular measure of partisan asymmetry—the "efficiency gap" of wasted votes. See *supra,* at 3–4. That measure was first developed in two academic articles published shortly before the initiation of this lawsuit. See Stephanopoulos & McGhee, Partisan Gerrymandering and the Efficiency Gap, 82 U. Chi. L. Rev. 831 (2015); McGhee, Measuring Partisan Bias in Single-Member District Electoral Systems, 39 Leg. Studies Q. 55 (2014).

The plaintiffs asserted in their complaint that the "efficiency gap captures in a single number all of a district plan's cracking and packing." 1 App. 28–29, Complaint ¶5 (emphasis deleted). That number is calculated by subtracting the statewide sum of one party's wasted votes from the statewide sum of the other party's wasted votes and dividing the result by the statewide sum of all votes cast, where "wasted votes" are defined as all votes cast for a losing candidate and all votes cast for a winning candidate beyond the 50% plus one that ensures victory. See Brief for Eric McGhee as *Amicus Curiae* 6, and n. 3. The

larger the number produced by that calculation, the greater the asymmetry between the parties in their efficiency in converting votes into legislative seats. Though they take no firm position on the matter, the plaintiffs have suggested that an efficiency gap in the range of 7% to 10% should trigger constitutional scrutiny. See Brief for Appellees 52–53, and n. 17.

The plaintiffs and their *amici curiae* promise us that the efficiency gap and similar measures of partisan asymmetry will allow the federal courts—armed with just "a pencil and paper or a hand calculator"—to finally solve the problem of partisan gerrymandering that has confounded the Court for decades. Brief for Heather K. Gerken et al. as *Amici Curiae* 27 (citing Wang, Let Math Save Our Democracy, N. Y. Times, Dec. 5, 2015). We need not doubt the plaintiffs' math. The difficulty for standing purposes is that these calculations are an average measure. They do not address the effect that a gerrymander has on the votes of particular citizens. Partisan-asymmetry metrics such as the efficiency gap measure something else entirely: the effect that a gerrymander has on the fortunes of political parties.

Consider the situation of Professor Whitford, who lives in District 76, where, defendants contend, Democrats are "naturally" packed due to their geographic concentration, with that of plaintiff Mary Lynne Donohue, who lives in Assembly District 26 in Sheboygan, where Democrats like her have allegedly been deliberately cracked. By all accounts, Act 43 has not affected Whitford's individual vote for his Assembly representative—even plaintiffs' own demonstration map resulted in a virtually identical district for him. Donohue, on the other hand, alleges that Act 43 burdened her individual vote. Yet neither the efficiency gap nor the other measures of partisan asymmetry offered by the plaintiffs are capable of telling the difference between what Act 43 did to Whitford and what it did

to Donohue. The single statewide measure of partisan advantage delivered by the efficiency gap treats Whitford and Donohue as indistinguishable, even though their individual situations are quite different.

That shortcoming confirms the fundamental problem with the plaintiffs' case as presented on this record. It is a case about group political interests, not individual legal rights. But this Court is not responsible for vindicating generalized partisan preferences. The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.

## III

In cases where a plaintiff fails to demonstrate Article III standing, we usually direct the dismissal of the plaintiff's claims. See, *e.g., DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 354 (2006). This is not the usual case. It concerns an unsettled kind of claim this Court has not agreed upon, the contours and justiciability of which are unresolved. Under the circumstances, and in light of the plaintiffs' allegations that Donohue, Johnson, Mitchell, and Wallace live in districts where Democrats like them have been packed or cracked, we decline to direct dismissal.

We therefore remand the case to the District Court so that the plaintiffs may have an opportunity to prove concrete and particularized injuries using evidence—unlike the bulk of the evidence presented thus far—that would tend to demonstrate a burden on their individual votes. Cf. *Alabama Legislative Black Caucus*, 575 U. S., at \_\_\_ (slip op., at 8) (remanding for further consideration of the plaintiffs' gerrymandering claims on a district-by-district basis). We express no view on the merits of the plaintiffs' case. We caution, however, that "standing is not dispensed in gross": A plaintiff's remedy must be tailored to redress the plaintiff's particular injury. *Cuno*, 547 U. S., at 353.

The judgment of the District Court is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1161

_____

## BEVERLY R. GILL, ET AL., APPELLANTS _v._ WILLIAM WHITFORD, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WISCONSIN

[June 18, 2018]

JUSTICE KAGAN, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR join, concurring.

The Court holds today that a plaintiff asserting a partisan gerrymandering claim based on a theory of vote dilution must prove that she lives in a packed or cracked district in order to establish standing. See _ante,_ at 14–17. The Court also holds that none of the plaintiffs here have yet made that required showing. See _ante,_ at 17.

I agree with both conclusions, and with the Court's decision to remand this case to allow the plaintiffs to prove that they live in packed or cracked districts, see _ante,_ at 21. I write to address in more detail what kind of evidence the present plaintiffs (or any additional ones) must offer to support that allegation. And I write to make some observations about what would happen if they succeed in proving standing—that is, about how their vote dilution case could then proceed on the merits. The key point is that the case could go forward in much the same way it did below: Given the charges of statewide packing and cracking, affecting a slew of districts and residents, the challengers could make use of statewide evidence and seek a statewide remedy.

I also write separately because I think the plaintiffs may have wanted to do more than present a vote dilution

theory. Partisan gerrymandering no doubt burdens individual votes, but it also causes other harms. And at some points in this litigation, the plaintiffs complained of a different injury—an infringement of their First Amendment right of association. The Court rightly does not address that alternative argument: The plaintiffs did not advance it with sufficient clarity or concreteness to make it a real part of the case. But because on remand they may well develop the associational theory, I address the standing requirement that would then apply. As I'll explain, a plaintiff presenting such a theory would not need to show that her particular voting district was packed or cracked for standing purposes because that fact would bear no connection to her substantive claim. Indeed, everything about the litigation of that claim—from standing on down to remedy—would be statewide in nature.

Partisan gerrymandering, as this Court has recognized, is "incompatible with democratic principles." *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 1) (quoting *Vieth* v. *Jubelirer*, 541 U. S. 267, 292 (2004) (plurality opinion); alterations omitted). More effectively every day, that practice enables politicians to entrench themselves in power against the people's will. And only the courts can do anything to remedy the problem, because gerrymanders benefit those who control the political branches. None of those facts gives judges any excuse to disregard Article III's demands. The Court is right to say they were not met here. But partisan gerrymandering injures enough individuals and organizations in enough concrete ways to ensure that standing requirements, properly applied, will not often or long prevent courts from reaching the merits of cases like this one. Or from insisting, when they do, that partisan officials stop degrading the nation's democracy.

## I

As the Court explains, the plaintiffs' theory in this case focuses on vote dilution. See *ante,* at 15 ("Here, the plaintiffs' partisan gerrymandering claims turn on allegations that their votes have been diluted"); see also *ante,* at 14, 16–17. That is, the plaintiffs assert that Wisconsin's State Assembly Map has caused their votes "to carry less weight than [they] would carry in another, hypothetical district." *Ante,* at 16. And the mechanism used to wreak that harm is "packing" and "cracking." *Ante,* at 14. In a relatively few districts, the mapmakers packed supermajorities of Democratic voters—well beyond the number needed for a Democratic candidate to prevail. And in many more districts, dispersed throughout the State, the mapmakers cracked Democratic voters—spreading them sufficiently thin to prevent them from electing their preferred candidates. The result of both practices is to "waste" Democrats' votes. *Ibid.*

The harm of vote dilution, as this Court has long stated, is "individual and personal in nature." *Reynolds* v. *Sims*, 377 U. S. 533, 561 (1964); see *ante,* at 15. It arises when an election practice—most commonly, the drawing of district lines—devalues one citizen's vote as compared to others. Of course, such practices invariably affect more than one citizen at a time. For example, our original one-person, one-vote cases considered how malapportioned maps "contract[ed] the value" of urban citizens' votes while "expand[ing]" the value of rural citizens' votes. *Wesberry* v. *Sanders*, 376 U. S. 1, 7 (1964). But we understood the injury as giving diminished weight to each particular vote, even if millions were so touched. In such cases, a voter living in an overpopulated district suffered "disadvantage to [herself] as [an] individual[]": Her vote counted for less than the votes of other citizens in her State. *Baker* v. *Carr*, 369 U. S. 186, 206 (1962); see *ante,* at 15. And that kind of disadvantage is what a plaintiff

asserting a vote dilution claim—in the one-person, one-vote context or any other—always alleges.

To have standing to bring a partisan gerrymandering claim based on vote dilution, then, a plaintiff must prove that the value of her own vote has been "contract[ed]." *Wesberry*, 376 U. S., at 7. And that entails showing, as the Court holds, that she lives in a district that has been either packed or cracked. See *ante,* at 17. For packing and cracking are the ways in which a partisan gerrymander dilutes votes. Cf. *Voinovich* v. *Quilter*, 507 U. S. 146, 153–154 (1993) (explaining that packing or cracking can also support racial vote dilution claims). Consider the perfect form of each variety. When a voter resides in a packed district, her preferred candidate will win no matter what; when a voter lives in a cracked district, her chosen candidate stands no chance of prevailing. But either way, such a citizen's vote carries less weight—has less consequence—than it would under a neutrally drawn map. See *ante,* at 14, 16. So when she shows that her district has been packed or cracked, she proves, as she must to establish standing, that she is "among the injured." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 563 (1992) (quoting *Sierra Club* v. *Morton*, 405 U. S. 727, 735 (1972)); see *ante,* at 17.

In many partisan gerrymandering cases, that threshold showing will not be hard to make. Among other ways of proving packing or cracking, a plaintiff could produce an alternative map (or set of alternative maps)—comparably consistent with traditional districting principles—under which her vote would carry more weight. Cf. *Ante,* at 20 (suggesting how an alternative map may shed light on vote dilution or its absence); *Easley* v. *Cromartie*, 532 U. S. 234, 258 (2001) (discussing the use of alternative maps as evidence in a racial gerrymandering case); *Cooper* v. *Harris*, 581 U. S. ___, ___–___ (2017) (slip op., at 28–34) (same); Brief for Political Geography Scholars as *Amici*

*Curiae* 12–14 (describing computer simulation techniques for devising alternative maps). For example, a Democratic plaintiff living in a 75%-Democratic district could prove she was packed by presenting a different map, drawn without a focus on partisan advantage, that would place her in a 60%-Democratic district. Or conversely, a Democratic plaintiff residing in a 35%-Democratic district could prove she was cracked by offering an alternative, neutrally drawn map putting her in a 50–50 district. The precise numbers are of no import. The point is that the plaintiff can show, through drawing alternative district lines, that partisan-based packing or cracking diluted her vote.

Here, the Court is right that the plaintiffs have so far failed to make such a showing. See *ante,* at 17–20. William Whitford was the only plaintiff to testify at trial about the alleged gerrymander's effects. He expressly acknowledged that his district would be materially identical under any conceivable map, whether or not drawn to achieve partisan advantage. See *ante,* at 18, 20. That means Wisconsin's plan could not have diluted Whitford's own vote. So whatever other claims he might have, see *infra,* at 8–9, Whitford is not "among the injured" in a vote dilution challenge. *Lujan,* 504 U. S., at 563 (quoting *Sierra Club,* 405 U. S., at 735). Four other plaintiffs differed from Whitford by alleging in the complaint that they lived in packed or cracked districts. But for whatever reason, they failed to back up those allegations with evidence as the suit proceeded. See *ante,* at 17. So they too did not show the injury—a less valuable vote—central to their vote dilution theory.

That problem, however, may be readily fixable. The Court properly remands this case to the District Court "so that the plaintiffs may have an opportunity" to "demonstrate a burden on their individual votes." *Ante,* at 21. That means the plaintiffs—both the four who initially made those assertions and any others (current or newly

joined)—now can introduce evidence that their individual districts were packed or cracked. And if the plaintiffs' more general charges have a basis in fact, that evidence may well be at hand. Recall that the plaintiffs here alleged—and the District Court found, see 218 F. Supp. 3d 837, 896 (WD Wis. 2016)—that a unified Republican government set out to ensure that Republicans would control as many State Assembly seats as possible over a decade (five consecutive election cycles). To that end, the government allegedly packed and cracked Democrats throughout the State, not just in a particular district (see, *e.g., Benisek* v. *Lamone*, No. 17–333) or region. Assuming that is true, the plaintiffs should have a mass of packing and cracking proof, which they can now also present in district-by-district form to support their standing. In other words, a plaintiff residing in each affected district can show, through an alternative map or other evidence, that packing or cracking indeed occurred there. And if (or to the extent) that test is met, the court can proceed to decide all distinctive merits issues and award appropriate remedies.

When the court addresses those merits questions, it can consider statewide (as well as local) evidence. Of course, the court below and others like it are currently debating, without guidance from this Court, what elements make up a vote dilution claim in the partisan gerrymandering context. But assume that the plaintiffs must prove illicit partisan intent—a purpose to dilute Democrats' votes in drawing district lines. The plaintiffs could then offer evidence about the mapmakers' goals in formulating the entire statewide map (which would predictably carry down to individual districting decisions). So, for example, the plaintiffs here introduced proof that the mapmakers looked to partisan voting data when drawing districts throughout the State—and that they graded draft maps according to the amount of advantage those maps con-

ferred on Republicans. See 218 F. Supp. 3d, at 890–896. This Court has explicitly recognized the relevance of such statewide evidence in addressing racial gerrymandering claims of a district-specific nature. "Voters," we held, "of course[] can present statewide *evidence* in order to prove racial gerrymandering in a particular district." *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 7). And in particular, "[s]uch evidence is perfectly relevant" to showing that mapmakers had an invidious "motive" in drawing the lines of "multiple districts in the State." *Id.,* at \_\_\_ (slip op., at 10). The same should be true for partisan gerrymandering.

Similarly, cases like this one might warrant a statewide remedy. Suppose that mapmakers pack or crack a critical mass of State Assembly districts all across the State to elect as many Republican politicians as possible. And suppose plaintiffs residing in those districts prevail in a suit challenging that gerrymander on a vote dilution theory. The plaintiffs might then receive exactly the relief sought in this case. To be sure, remedying each plaintiff's vote dilution injury "requires revising only such districts as are necessary to reshape [that plaintiff's] district—so that the [plaintiff] may be unpacked or uncracked, as the case may be." *Ante,* at 16. But with enough plaintiffs joined together—attacking all the packed and cracked districts in a statewide gerrymander—those obligatory revisions could amount to a wholesale restructuring of the State's districting plan. The Court recognizes as much. It states that a proper remedy in a vote dilution case "does not *necessarily* require restructuring all of the State's legislative districts." *Ibid.* (emphasis added). Not necessarily—but possibly. It all depends on how much redistricting is needed to cure all the packing and cracking that the mapmakers have done.

## II

Everything said so far relates only to suits alleging that a partisan gerrymander dilutes individual votes. That is the way the Court sees this litigation. See *ante,* at 14–17. And as I'll discuss, that is the most reasonable view. See *infra,* at 10–11. But partisan gerrymanders inflict other kinds of constitutional harm as well. Among those injuries, partisan gerrymanders may infringe the First Amendment rights of association held by parties, other political organizations, and their members. The plaintiffs here have sometimes pointed to that kind of harm. To the extent they meant to do so, and choose to do so on remand, their associational claim would occasion a different standing inquiry than the one in the Court's opinion.

JUSTICE KENNEDY explained the First Amendment associational injury deriving from a partisan gerrymander in his concurring opinion in *Vieth,* 541 U. S. 267. "Representative democracy," JUSTICE KENNEDY pointed out, is today "unimaginable without the ability of citizens to band together" to advance their political beliefs. *Id.,* at 314 (opinion concurring in judgment) (quoting *California Democratic Party* v. *Jones,* 530 U. S. 567, 574 (2000)). That means significant "First Amendment concerns arise" when a State purposely "subject[s] a group of voters or their party to disfavored treatment." 541 U. S., at 314. Such action "burden[s] a group of voters' representational rights." *Ibid.*; see *id.,* at 315 (similarly describing the "burden[] on a disfavored party and its voters" and the "burden [on] a group's representational rights"). And it does so because of their "political association," "participation in the electoral process," "voting history," or "expression of political views." *Id.,* at 314–315.

As so formulated, the associational harm of a partisan gerrymander is distinct from vote dilution. Consider an active member of the Democratic Party in Wisconsin who resides in a district that a partisan gerrymander has left

untouched (neither packed nor cracked). His individual vote carries no less weight than it did before. But if the gerrymander ravaged the party he works to support, then he indeed suffers harm, as do all other involved members of that party. This is the kind of "burden" to "a group of voters' representational rights" JUSTICE KENNEDY spoke of. *Id.,* at 314. Members of the "disfavored party" in the State, *id.,* at 315, deprived of their natural political strength by a partisan gerrymander, may face difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives). See *Anderson* v. *Celebrezze*, 460 U. S. 780, 791–792, and n. 12 (1983) (concluding that similar harms inflicted by a state election law amounted to a "burden imposed on . . . associational rights"). And what is true for party members may be doubly true for party officials and triply true for the party itself (or for related organizations). Cf. *California Democratic Party*, 530 U. S., at 586 (holding that a state law violated state political parties' First Amendment rights of association). By placing a state party at an enduring electoral disadvantage, the gerrymander weakens its capacity to perform all its functions.

And if that is the essence of the harm alleged, then the standing analysis should differ from the one the Court applies. Standing, we have long held, "turns on the nature and source of the claim asserted." *Warth* v. *Seldin*, 422 U. S. 490, 500 (1975). Indeed, that idea lies at the root of today's opinion. It is because the Court views the harm alleged as vote dilution that it (rightly) insists that each plaintiff show packing or cracking in her own district to establish her standing. See *ante,* at 14–17; *supra,* at 3–4. But when the harm alleged is not district specific, the proof needed for standing should not be district specific either. And the associational injury flowing from a

statewide partisan gerrymander, whether alleged by a party member or the party itself, has nothing to do with the packing or cracking of any single district's lines. The complaint in such a case is instead that the gerrymander has burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects. See *supra,* at 8–9. Because a plaintiff can have that complaint without living in a packed or cracked district, she need not show what the Court demands today for a vote dilution claim. Or said otherwise: Because on this alternative theory, the valued association and the injury to it are statewide, so too is the relevant standing requirement.

On occasion, the plaintiffs here have indicated that they have an associational claim in mind. In addition to repeatedly alleging vote dilution, their complaint asserted in general terms that Wisconsin's districting plan infringes their "First Amendment right to freely associate with each other without discrimination by the State based on that association." 1 App. 61, Complaint ¶91. Similarly, the plaintiffs noted before this Court that "[b]eyond diluting votes, partisan gerrymandering offends First Amendment values by penalizing citizens because of . . . their association with a political party." Brief for Appellees 36 (internal quotation marks omitted). And finally, the plaintiffs' evidence of partisan asymmetry well fits a suit alleging associational injury (although, as noted below, that was not how it was used, see *infra,* at 11). As the Court points out, what those statistical metrics best measure is a gerrymander's effect "on the fortunes of political parties" and those associated with them. *Ante,* at 20.

In the end, though, I think the plaintiffs did not sufficiently advance a First Amendment associational theory to avoid the Court's holding on standing. Despite referring to that theory in their complaint, the plaintiffs tried this case as though it were about vote dilution alone. Their

testimony and other evidence went toward establishing the effects of rampant packing and cracking on the value of individual citizens' votes. Even their proof of partisan asymmetry was used for that purpose—although as noted above, it could easily have supported the alternative theory of associational harm, see *supra,* at 10. The plaintiffs joining in this suit do not include the State Democratic Party (or any related statewide organization). They did not emphasize their membership in that party, or their activities supporting it. And they did not speak to any tangible associational burdens—ways the gerrymander had debilitated their party or weakened its ability to carry out its core functions and purposes, see *supra*, at 8–9. Even in this Court, when disputing the State's argument that they lacked standing, the plaintiffs reiterated their suit's core theory: that the gerrymander "intentionally, severely, durably, and unjustifiably dilutes Democratic votes." Brief for Appellees 29–30. Given that theory, the plaintiffs needed to show that their own votes were indeed diluted in order to establish standing.

But nothing in the Court's opinion prevents the plaintiffs on remand from pursuing an associational claim, or from satisfying the different standing requirement that theory would entail. The Court's opinion is about a suit challenging a partisan gerrymander on a particular ground—that it dilutes the votes of individual citizens. That opinion "leave[s] for another day consideration of other possible theories of harm not presented here and whether those theories might present justiciable claims giving rise to statewide remedies." *Ante,* at 16. And in particular, it leaves for another day the theory of harm advanced by JUSTICE KENNEDY in *Vieth*: that a partisan gerrymander interferes with the vital "ability of citizens to band together" to further their political beliefs. 541 U. S., at 314 (quoting *California Democratic Party*, 530 U. S., at 574). Nothing about that injury is "generalized" or "ab-

stract," as the Court says is true of the plaintiffs' dissatis-
faction with the "overall composition of the legislature."
*Ante,* at 16. A suit raising an associational theory com-
plains of concrete "burdens on a disfavored party" and its
members as they pursue their political interests and goals.
*Vieth,* 541 U. S., at 315 (opinion of KENNEDY, J.); see
*supra,* at 8–9. And when the suit alleges that a gerry-
mander has imposed those burdens on a statewide basis,
then its litigation should be statewide too—as to standing,
liability, and remedy alike.

## III

Partisan gerrymandering jeopardizes "[t]he ordered
working of our Republic, and of the democratic process."
*Vieth,* 541 U. S., at 316 (opinion of KENNEDY, J.). It en-
ables a party that happens to be in power at the right time
to entrench itself there for a decade or more, no matter
what the voters would prefer. At its most extreme, the
practice amounts to "rigging elections." *Id.,* at 317 (inter-
nal quotation marks omitted). It thus violates the most
fundamental of all democratic principles—that "the voters
should choose their representatives, not the other way
around." *Arizona State Legislature*, 576 U. S., at ___ (slip
op., at 35) (quoting Berman, Managing Gerrymandering,
83 Texas L. Rev. 781 (2005)).

And the evils of gerrymandering seep into the legisla-
tive process itself. Among the *amicus* briefs in this case
are two from bipartisan groups of congressional members
and state legislators. They know that both parties gerry-
mander. And they know the consequences. The congres-
sional brief describes a "cascade of negative results" from
excessive partisan gerrymandering: indifference to swing
voters and their views; extreme political positioning de-
signed to placate the party's base and fend off primary
challenges; the devaluing of negotiation and compromise;
and the impossibility of reaching pragmatic, bipartisan

solutions to the nation's problems. Brief for Bipartisan Group of Current and Former Members of Congress as *Amici Curiae* 4; see *id.,* at 10–23. The state legislators tell a similar story. In their view, partisan gerrymandering has "sounded the death-knell of bipartisanship," creating a legislative environment that is "toxic" and "tribal[]." Brief for Bipartisan Group of 65 Current and Former State Legislators as *Amici Curiae* 6, 25.

I doubt James Madison would have been surprised. What, he asked when championing the Constitution, would make the House of Representatives work? The House must be structured, he answered, to instill in its members "an habitual recollection of their dependence on the people." The Federalist No. 57, p. 352 (C. Rossiter ed. 1961). Legislators must be "compelled to anticipate the moment" when their "exercise of [power] is to be reviewed." *Ibid.* When that moment does not come—when legislators can entrench themselves in office despite the people's will—the foundation of effective democratic governance dissolves.

And our history offers little comfort. Yes, partisan gerrymandering goes back to the Republic's earliest days; and yes, American democracy has survived. But technology makes today's gerrymandering altogether different from the crude linedrawing of the past. New redistricting software enables pinpoint precision in designing districts. With such tools, mapmakers can capture every last bit of partisan advantage, while still meeting traditional districting requirements (compactness, contiguity, and the like). See Brief for Political Science Professors as *Amici Curiae* 28. Gerrymanders have thus become ever more extreme and durable, insulating officeholders against all but the most titanic shifts in the political tides. The 2010 redistricting cycle produced some of the worst partisan gerrymanders on record. *Id.,* at 3. The technology will only get better, so the 2020 cycle will only get worse.

Courts have a critical role to play in curbing partisan gerrymandering. Over fifty years ago, we committed to providing judicial review in the redistricting arena, because we understood that "a denial of constitutionally protected rights demands judicial protection." *Reynolds*, 377 U. S., at 566. Indeed, the need for judicial review is at its most urgent in these cases. For here, politicians' incentives conflict with voters' interests, leaving citizens without any political remedy for their constitutional harms. Of course, their dire need provides no warrant for courts to disregard Article III. Because of the way this suit was litigated, I agree that the plaintiffs have so far failed to establish their standing to sue, and I fully concur in the Court's opinion. But of one thing we may unfortunately be sure. Courts—and in particular this Court—will again be called on to redress extreme partisan gerrymanders. I am hopeful we will then step up to our responsibility to vindicate the Constitution against a contrary law.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1161

_____

## BEVERLY R. GILL, ET AL., APPELLANTS *v.* WILLIAM WHITFORD, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WISCONSIN

[June 18, 2018]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring in part and concurring in the judgment.

I join Parts I and II of the Court's opinion because I agree that the plaintiffs have failed to prove Article III standing. I do not join Part III, which gives the plaintiffs another chance to prove their standing on remand. When a plaintiff lacks standing, our ordinary practice is to remand the case with instructions to dismiss for lack of jurisdiction. *E.g., Lance* v. *Coffman*, 549 U. S. 437, 442 (2007) (*per curiam*); *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 354 (2006); *United States* v. *Hays*, 515 U. S. 737, 747 (1995). The Court departs from our usual practice because this is supposedly "not the usual case." *Ante,* at 21. But there is nothing unusual about it. As the Court explains, the plaintiffs' lack of standing follows from long-established principles of law. See *ante,* at 13–17. After a year and a half of litigation in the District Court, including a 4-day trial, the plaintiffs had a more-than-ample opportunity to prove their standing under these principles. They failed to do so. Accordingly, I would have remanded this case with instructions to dismiss.