OSTEEN, JR., District Judge, concurring in part and dissenting in part:
In Gill , prior to explaining the issue of standing as relevant to a claim of political gerrymandering, the Court summarized the gerrymandering line of cases. Gill v. Whitford , 585 U.S. ----, 138 S.Ct. 1916, 1926-29, --- L.Ed.2d ---- (2018). The Court recognized, inter alia , that in Davis v. Bandemer "[a] majority of the Court agreed that the case before it was justiciable." Gill , 138 S.Ct. at 1927. The Court concluded its summary of these cases by stating:
Our considerable efforts in Gaffney, Bandemer , Vieth , and LULAC leave unresolved whether such claims may be brought in cases involving allegations of partisan gerrymandering. In particular, two threshold questions remain: what is necessary to show standing in a case of this sort, and whether those claims are justiciable. Here we do not decide the latter question because the plaintiffs in this case have not shown standing under the theory upon which they based their claims for relief.
Id. at 1929.
Of particular note to me are Bandemer and Vieth in terms of the law a district court is required to apply. As Justice Scalia explained in Vieth , "[e]ighteen years ago, we held that the Equal Protection Clause grants judges the power-and duty-to control political gerrymandering, see Davis v. Bandemer , 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986)." Vieth v. Jubelirer , 541 U.S. 267, 276, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004). Bandemer held "that a political gerrymandering claim could succeed where plaintiffs showed 'both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." Vieth , 541 U.S. at 281, 124 S.Ct. 1769 (quoting Bandemer , 478 U.S. at 127, 106 S.Ct. 2797 ). Although Justice Scalia posited in Vieth that political gerrymandering claims are nonjusticiable and that Bandemer was wrongly decided, Bandemer was not overturned by Vieth . Similarly, Gill did not overturn Bandemer , as Gill did not reach the question of justiciability.[1]
*946 Therefore, absent a contrary ruling from the Supreme Court, partisan gerrymandering claims are justiciable under the Equal Protection Clause and lower courts are obliged to apply that law and articulate a standard for adjudication.
The Supreme Court remanded this present case for "further consideration in light of Gill v. Whitford ." Common Cause v. Rucho , 279 F.Supp.3d 587 (M.D.N.C. 2018), vacated and remanded , --- U.S. ----, 138 S.Ct. 2679, --- L.Ed.2d ---- (June 25, 2018) (mem.). This order requires us to reconsider standing and related issues in light of Gill . With respect to standing, the Court in Gill explained:
We have long recognized that a person's right to vote is "individual and personal in nature." Reynolds v. Sims, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. Baker, 369 U.S., at 206, 82 S.Ct. 691. The plaintiffs in this case alleged that they suffered such injury from partisan gerrymandering, which works through "packing" and "cracking" voters of one party to disadvantage those voters. 1 App. 28-29, 32-33, Complaint ¶¶ 5, 15. That is, the plaintiffs claim a constitutional right not to be placed in legislative districts deliberately designed to "waste" their votes in elections where their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking). Id. , at 32-33, ¶ 15. To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific.
Gill , 138 S.Ct. at 1929-30. In determining standing, therefore, a plaintiff in a political gerrymandering case must demonstrate district-specific injury within the context of:
the familiar three-part test for Article III standing: that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins , 578 U.S. ----, ----, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).
Id. at 1929-30.
In this case, as in Gill , Plaintiffs asserted both district-specific political gerrymandering claims and statewide challenges to the apportionment of Congressional districts. The Court in Gill held that statewide challenges are not cognizable for purposes of standing. In rejecting a statewide challenge, the Court stated:
The plaintiffs argue that their claim of statewide injury is analogous to the claims presented in Baker and Reynolds, which they assert were "statewide in nature" because they rested on allegations that "districts throughout a state [had] been malapportioned." But, as we have already noted, the holdings in Baker and Reynolds were expressly premised on the understanding that the injuries giving rise to those claims were "individual and personal in nature," Reynolds, 377 U.S., at 561, 84 S.Ct. 1362 because the claims were brought by voters who alleged "facts showing disadvantage to themselves as individuals," Baker, 369 U.S., at 206, 82 S.Ct. 691.
The plaintiffs' mistaken insistence that the claims in Baker and Reynolds were "statewide in nature" rests on a failure to distinguish injury from remedy. In those malapportionment cases, the only way to vindicate an individual *947 plaintiff's right to an equally weighted vote was through a wholesale "restructuring of the geographical distribution of seats in a state legislature." Reynolds , 377 U.S., at 561, 84 S.Ct. 1362.
Here, the plaintiffs' partisan gerrymandering claims turn on allegations that their votes have been diluted. That harm arises from the particular composition of the voter's own district, which causes his vote-having been packed or cracked-to carry less weight than it would carry in another, hypothetical district . Remedying the individual voter's harm, therefore, does not necessarily require restructuring all of the State's legislative districts.
Id. at 1930-31 (emphasis added).
Applying Bandemer , Vieth , and Gill , I find under Supreme Court precedent that partisan gerrymandering claims are justiciable under the Equal Protection Clause. I find this to be true even in the absence of a recognized jurisprudential remedy. I join the majority opinion to hold, as required by Gill , that Plaintiffs are required to show standing on the basis of the composition of his or her own district. I also join the majority to find that some of the individual Plaintiffs, as explained below, have alleged and proven both standing and a violation of the Equal Protection Clause. Specifically, I concur with the opinion of the majority that those individual Plaintiffs alleging "cracking" for purposes of partisan advantage have alleged and proven "an individual and personal injury" as opposed to a generalized grievance against governmental conduct of which he or she does not approve. I also concur that the organizations here - Common Cause, the Democratic Party, and the League of Women Voters - have standing to assert the claims of the individual members of their respective organizations with respect to the individual and personal injury sustained by those members residing in individual districts which were cracked. As to the organizational Plaintiffs, I concur with the majority that they have met their burden on behalf of aggrieved individual members (with respect to ten challenged districts instead of thirteen) that "Plaintiffs who reside and vote in each of the thirteen challenged congressional districts testified to, introduced evidence to support, and, in all but one case, ultimately proved the type of dilutionary injury the Supreme Court recognized in Gill ," that is, the cracking and packing of districts as described in Gill . Maj. Op. at 819. I concur with the majority that Plaintiffs have shown both a partisan intent to subordinate the interests of non-Republican voters and that those partisan considerations were the predominant factor in the redistricting. I also concur with the majority that Defendants have not justified the effects of the 2016 Plan. I therefore agree with the majority's conclusion that the 2016 Plan violates the Equal Protection Clause. Finally, I concur with the majority's remedial action.
For the reasons stated hereafter and to the extent described herein, I also join the majority's conclusion that Plaintiffs have shown that the 2016 Plan violates Article I, Sections 2 and 4 of the United States Constitution by proving that the drawers of the Plan intended to dictate and preordain election outcomes and disfavor a class of candidates. Although Gill addressed standing within an Equal Protection claim, I agree with the majority that the individual Plaintiffs have established standing, as voters, to proceed with a claim under Article I, Sections 2 and 4 of the United States Constitution for reasons similar to the Equal Protection standing argument.
I disagree with the majority on several points. First, I disagree that a Plaintiff who demonstrates "packing" but concedes election of the candidate of his or her choice has standing or has demonstrated a constitutional injury under the facts as *948 presently presented. Second, I disagree that there is a distinction between "political considerations" and "partisan interests" or that consideration of partisan, political interests in redistricting constitutes a power that was not delegated to the states or is otherwise prohibited in legislative action, including districting. I therefore weigh the maps created by Dr. Chen differently from the majority, as I do not find a non-partisan map drawing process, as performed by Dr. Chen, to be a necessary or relevant comparison. Third, I disagree that any of the Plaintiffs in this case have standing to assert a statewide claim as to the statewide collective effect of any political gerrymandering. Finally, assuming that partisan gerrymandering claims are justiciable under the First Amendment, I am unconvinced that Plaintiffs have proven an injury to their First Amendment rights and I dissent, for the same reasons I set forth previously, see Common Cause , 279 F.Supp.3d at 696 (Osteen, J., concurring in part and dissenting in part), from the majority's conclusion that the 2016 Plan violates the First Amendment.
I. Standing
Similar to this case, the plaintiffs in Gill alleged vote dilution resulting from packing and cracking districts for the purpose of gaining political advantage. Gill , 138 S.Ct. at 1929-30 ("The plaintiffs in this case alleged that they suffered such injury from partisan gerrymandering, which works through "packing" and "cracking" voters of one party to disadvantage those voters.") However, in my reading of Gill , I am not convinced the Court has held that both packing and cracking would serve to establish standing as a matter of law. Instead, as I read Gill , packing and cracking may constitute a basis upon which a plaintiff may establish standing if the criteria for standing are met as a factual matter under the test for standing set forth in Spokeo . For example, in describing the plaintiffs, the Court stated:
Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. Baker , 369 U.S., at 206, 82 S.Ct. 691. The plaintiffs in this case alleged that they suffered such injury from partisan gerrymandering, which works through "packing" and "cracking" voters of one party to disadvantage those voters. 1 App. 28-29, 32-33, Complaint ¶¶ 5, 15. That is, the plaintiffs claim a constitutional right not to be placed in legislative districts deliberately designed to "waste" their votes in elections where their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking). Id. , at 32-33, ¶ 15.
Gill , 138 S.Ct. at 1929-30. The Court later stated:
And the sum of the standing principles articulated here, as applied to this case, is that the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes. In this gerrymandering context that burden arises through a voter's placement in a "cracked" or "packed" district.
Id. at 1931. The Court phrased the relevant facts in terms of what was claimed ("plaintiffs claim a constitutional right") and how the harm is "understood," such that while I am convinced that cracking and packing could provide a basis upon which to find standing is present, that issue is dependent upon the facts found by a lower court. The Court concluded with the admonition that "[w]e express no view on the merits of the plaintiffs' case. We caution, however, that 'standing is not dispensed in gross.' A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." Id. at 1934 (quoting *949 DaimlerChrysler Corp. v. Cuno , 547 U.S. 332, 354, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) ).
Therefore, in a case involving allegations of cracking and packing, we are to determine whether the facts associated with cracking and packing are sufficient to confer standing by applying the tests set forth in Spokeo , 136 S.Ct. at 1547, and Lujan v. Defenders of Wildlife , 504 U.S. 555, 560-61, 560 n.1, 112 S.Ct. 2130, 119 L.Ed. 2d 351 (1992).
I am of the opinion that packing and cracking are objectively different with respect to standing. Here, as in Gill , the individual Plaintiffs in packed districts "claim a constitutional right not to be placed in legislative districts deliberately designed to 'waste' their votes in elections where their chosen candidates will win in landslides (packing)." Gill , 138 S.Ct. at 1930. And the vote dilution alleged by packing and proven at trial may establish an individual Plaintiff in a packed district sustained the "invasion of a legally protected interest" assuming a constitutional interest exists in not having a vote wasted. Lujan , 504 U.S. at 560, 112 S.Ct. 2130. However, standing also requires a concrete and particularized injury which "affects the plaintiff in a personal and individual way." Id. at 560 n.1, 112 S.Ct. 2130. Because a Democrat plaintiff in a packed district is indisputably able to elect the candidate of his or her choice, that individual has not sustained an injury which affects the voter in a personal and individual way. A packed district does not demonstrably inflict "the representational injury articulated in racial gerrymandering claims-that 'elected officials are more likely to believe that their primary obligation is to represent only the members of [the favored] group, rather than their constituency as a whole,' " Agre v. Wolfe , 284 F.Supp.3d 591, 641 (E.D. Pa.) (Schwarz, J., concurring), appeal dismissed , --- U.S. ----, 138 S.Ct. 2576, --- L.Ed.2d ---- (May 29, 2018) (mem.), and appeal dismissed sub nom., Scarnati v. Agre , --- U.S. ----, 138 S.Ct. 2602, --- L.Ed.2d ---- (June 4, 2018) (mem.) (quoting United States v. Hays , 515 U.S. 737, 744, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ). Instead, I believe a Democrat plaintiff living in a "packed" district is complaining about the process, the intent, and the invasion of a legally protected interest but all in the absence of an injury.
For example, the majority describes the packing in District 1 and its effect on Plaintiff Larry Hall. Maj. Op. at 821. As described by the majority, "District 1 amounts to a successful effort by the General Assembly to concentrate, or pack, voters who were unlikely to support a Republican candidate, and thereby dilute such voters' votes." Id. at 821. The majority finds that "Plaintiff Larry Hall resides in District 1, is a registered Democrat, and typically votes for Democrat candidates", id. , and that "Hall's vote would have carried greater weight in numerous other 'hypothetical districts.' " Id. at 48 (quoting Gill , 138 S.Ct. at 1931 ). For purposes of standing, I find that Plaintiff Hall has not established standing because his interest as a registered Democrat in voting for Democrat candidates has not been injured. He was able to elect the candidate of his choice from his district, a Democrat. I conclude that a Plaintiff residing in a packed district on the facts present before this court has not sustained an individual and personal injury but, instead, has proven a "collective political interest," and a "generalized grievance against governmental conduct of which he or she does not approve." Gill , 138 S.Ct. at 1930, 1932.
Nevertheless, the majority of the districts at issue in this case are ones within which Democrats contend and ultimately proved that cracking occurred, diminishing the power of Democrat voters to elect a Democrat candidate. As to these "cracked"
*950 districts, I agree with the majority that Plaintiffs have demonstrated the dilution of voting strength which appears to be recognized by Gill for purposes of standing. Those Plaintiffs who contend districts were cracked have alleged and proven an (1) an individual injury in fact resulting from their vote dilution claims, that is, the reduced ability to elect the candidate of his or her choice; (2) that is fairly traceable to the challenged conduct of the defendant, that is, cracking communities of interest; and (3) that is likely to be redressed by favorable decision. And although both cracking and packing may involve splitting communities of interest, only cracking has the result of producing a concrete and particularized harm.
Gill reminds us that the Federal Judiciary is charged with respecting "the proper-and properly limited-role of the courts in a democratic society." Gill , 138 S.Ct. at 1929 (quoting Allen v. Wright , 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ). Consistent with that limited role, Gill markedly, and for the first time in the context of political gerrymandering, directed the attention of courts and parties to the distinction between individualized injury and general political grievance. I therefore believe, based upon those considerations described by Gill , that Plaintiffs have not established standing as to statewide challenges to political gerrymandering. I would further find that the organizational Plaintiffs have standing only to the extent they challenge the districts on the basis of district-specific injury to individual members.
The Court in Gill reminds us, as lower courts, that:
[P]laintiffs may not rely on 'the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past.' A citizen's interest in the overall composition of the legislature is embodied in his right to vote for his representative. And the citizen's abstract interest in policies adopted by the legislature on the facts here is a nonjusticiable "general interest common to all members of the public."
Gill , 138 S.Ct. at 1931 (internal citations omitted). I find that the overall composition of the congressional delegation, whether 10-3, 9-4, or 7-6, or any other statewide claim of injury, is a non-justiciable claim of "general interest common to all members of the public." Id. (quoting Ex parte Levitt , 302 U.S. 633, 636, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (per curiam) ). To be clear, I find that the admissions of certain legislators of an intent to create a 10-3 congressional delegation constitutes evidence which may be considered in determining the manner of drafting individual districts and the intent to dilute certain voters within those districts, but I am not convinced that intent or the statewide plan provides standing for any Plaintiff to assert a claim based on statewide injury.
As noted above and found by the majority, the organizational Plaintiffs have standing, by and through their members, to challenge individual districts on behalf of the individual member-voters. Maj. Op. at 827. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc. , 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). However, I do not agree that the organizations have standing to challenge the districting plan on a statewide basis, nor do I find the organizational Plaintiffs have standing to assert political gerrymandering claims because of other *951 organizational purposes. The Court in Gill , applying a standard derived from racial gerrymandering, observed that "[a] plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.' " Gill , 138 S.Ct. at 1930 (quoting United States v. Hays , 515 U.S. 737, 744-45, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ).
For example, League of Women Voters allege in the Complaint:
LWVNC has standing to challenge the 2016 Plan. The Plan discriminates against North Carolina voters who associate with the Democratic Party by diluting their votes for the purpose of maintaining a 10-to-3 Republican advantage in congressional seats. The Plan thus directly impairs LWVNC's mission of encouraging civic engagement and nonpartisan redistricting reform. Additionally, LWVNC is a membership organization, and its members are harmed by the Plan because it dilutes Democratic votes and impairs Democratic voters' ability to elect their preferred congressional candidates. LWVNC's members' right to participate freely and equally in the political process is burdened as well by the Plan, which in many cases denies the ability to cast a meaningful vote altogether.
(Complaint, 1:16CV1164 (Doc. 1) at 7.) I do not find the League has standing to challenge an overall statewide plan drawn "for the purpose of maintaining a 10-to-3 Republican advantage in congressional seats," nor do I find the League has standing on behalf of voters who associate with the Democratic Party generally. To hold otherwise, in my opinion, is to recognize injury on the basis of general political grievance, a matter specifically rejected by Gill .
Similarly, Common Cause has asserted claims "on behalf of its members who are citizens of North Carolina and are registered Democratic voters, whose votes have been diluted or nullified ...", (Complaint, 1:16CV1026 (Doc. 1) at 2), and as to those claims I agree with the majority that Common Cause has standing. However, Common Cause further alleges that:
Common Cause is at the forefront of efforts to combat gerrymandering, no matter what party is responsible, in the belief that when election districts are created in a fair and neutral way, the People will be able to elect representatives who truly represent them. To that end, Common Cause has organized and led the coalitions that secured passage of ballot initiatives that created independent redistricting commissions in Arizona and California and campaigned for ratification of an amendment to the Florida Constitution prohibiting partisan gerrymandering.
Id. at 3. While those interests may or may not be appropriate from a policy objective, I do not find these interests, or similar interests in statewide reform, to provide standing on a statewide basis. For similar reasons, I find the Democratic Party has standing on behalf of individual members only.
II. Equal Protection and Partisan Political Considerations
The majority's opinion rejects Legislative Defendants' arguments that some degree of partisan gerrymandering is permissible, Maj. Op. at 851, and further finds that:
neither the constitutional delegation of redistricting to political bodies, nor historical practice, nor Supreme Court precedent supports Legislative Defendants assertion that it is sometimes permissible for a state redistricting body to draw district lines for the purpose of diminishing the electoral power of voters *952 who supported or are likely to support a disfavored party or candidate.
Id. The majority proceeds to clarify that:
our conclusion that twelve of the thirteen districts violate the Equal Protection Clause does not rest on our determination that States lack authority to engage in partisan gerrymandering ... in drawing congressional districts. In particular, we assume that a congressional district amounts to an unconstitutional partisan gerrymander only if the legislative body's predominant purpose in drawing the district was to subordinate the interests of a disfavored party ...."
Id. at ----.
I dissent from this portion of the majority's opinion and agree with the Legislative Defendants to find that the Constitution does permit consideration by a legislative body of both political and partisan interests in the redistricting process. This question has been addressed at length in a number of cases, and I agree with those cases recognizing the fact that political consideration and partisan advantage are not prohibited by the Constitution. See, e.g., Vieth v. Jubelirer , 541 U.S. 267, 274-76, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) ; Whitford v. Gill , 218 F.Supp.3d 837, 936 (W.D. Wis. 2016) (Griesbach, J., dissenting), vacated and remanded, Gill v. Whitford , --- U.S. ----, 138 S.Ct. 1916, --- L.Ed.2d ---- (2018) ; Agre v. Wolf , 284 F.Supp.3d 591,620-24 (E.D. Pa.), appeal dismissed , --- U.S. ----, 138 S.Ct. 2576, --- L.Ed.2d ---- (May 29, 2018) (mem.), and appeal dismissed sub nom., Scarnati v. Agre , --- U.S. ----, 138 S.Ct. 2602, --- L.Ed.2d ---- (June 4, 2018) (mem.).
The Constitution delegates redistricting power for federal elections to the States and their legislatures.[2] Legislative action is a political process, and issues addressed by those legislative bodies affecting constitutional questions - redistricting, the Second Amendment, the First Amendment, abortion, and the like - are all inherently political in nature. All of those constitutional issues, specifically the Second Amendment and abortion, are affected by legislation passed by legislative bodies which are partisan and political. Even if the legislative process should result in an unconstitutional law, that law can be overturned only on constitutional grounds and not due to any perceived inappropriate level of partisan political consideration. Courts have never considered or required that constitutional issues be addressed only in a nonpartisan, fair, and neutral manner. I find the same is true for political and partisan consideration as part of redistricting. As the plurality in Bandemer observed, "[i]t would be idle ... to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it .... Politics and political considerations are inseparable from districting and apportionment." Bandemer , 478 U.S. at 128, 106 S.Ct. 2797 *953 (internal citations omitted) (quoting Gaffney v. Cummings , 412 U.S. 735, 752-53, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) ). Although Bandemer has been abrogated to some degree, see Common Cause v. Rucho , 240 F.Supp.3d 376, 387 (M.D.N.C. 2017) (per curiam), this observation remains true today.
The Court has recognized many times in redistricting and apportionment cases that some degree of partisanship and political consideration is constitutionally permissible in a redistricting process undertaken by partisan actors. See, e.g., Hunt v. Cromartie , 526 U.S. 541, 551, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) ("Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact."); Miller v. Johnson , 515 U.S. 900, 914, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ("[R]edistricting in most cases will implicate a political calculus in which various interests compete for recognition ...."); Gaffney , 412 U.S. at 753, 93 S.Ct. 2321 ("Politics and political considerations are inseparable from districting and apportionment."); see also Cooper v. Harris , --- U.S. ----, 137 S.Ct. 1455, 1488, 197 L.Ed.2d 837 (2017) (Alito, J., concurring in part and dissenting in part) (recognizing the constitutionality of at least some amount of political gerrymandering); Whitford , 218 F.Supp.3d at 934-35 (Griesbach, J., dissenting) ("The Supreme Court has long acknowledged partisan considerations are inevitable when partisan politicians draw maps."). And Congress, though it could presumably act to limit partisan gerrymandering under its Article I, Section 4 authority, has chosen only to require single-member districts. 2 U.S.C. § 2c.
I do not find, therefore, that the Constitution forbids a political body from taking into account partisan considerations, and indeed partisan advantage, when producing a redistricting plan. I agree with the majority, however, that when partisan considerations predominate a legislature may act contrary to the Equal Protection Clause under existing precedent.
Because I do not find the Constitution forbids a political body from taking into account partisan considerations, I do not find the North Carolina congressional maps submitted by Plaintiff's expert, Jowei Chen, as persuasive as the majority. Dr. Chen drafted maps without consideration to partisan interests. Declaration of Dr. Jowei Chen, 1:16CV1026 (Doc. 130-2) at 2. As Dr. Chen describes:
In connection with my March 1, 2017 expert report in this litigation, I turned over all data concerning 1,000 North Carolina congressional maps created as Simulation Set 1, produced using a computer simulation process following only the non-partisan portions of the Adopted Criteria used for the 2016 Plan. I also turned over all data concerning 1,000 additional congressional maps created as Simulation Set 2, produced using a simulation process following the non-partisan portions of the Adopted Criteria and avoiding the pairing of any incumbents .
Id. (emphasis added). Dr. Chen then compared those maps as to each district and the enacted 2016 Plan. Id. at 2-3. I do not think there is any dispute that maps for purposes of establishing congressional districts could be drawn using non-partisan criteria. It is also undisputed that partisan advantage was a factor in drawing the 2016 Plan. See Maj. Op. at 803-04 (describing the process used to draw maps under the 2016 Plan).
In my opinion, Dr. Chen's maps demonstrate two facts. First, they provide evidence that political partisan consideration *954 affected the districts as drafted in the 2016 Plan, a fact which is hardly noteworthy as Defendants admit as much. Second, and significantly, Dr. Chen's maps have been admitted and argued as the alternative to the 2016 Plan. The League Plaintiffs argue:
Turning from the fact of the 2016 Plan's cracking and packing to their lack of necessity, plaintiffs focus here on a single alternative map: Professor Chen's Plan 2-297. As noted earlier, several types of evidence may be used at this stage of the inquiry, including the data about thousands of simulated maps presented by the Common Cause plaintiffs. Dkt. 130-2. In the League plaintiffs' view, a single alternative map is a simple and intuitive way to show that a challenged plan's cracking and packing could have been avoided. A single alternative map also has the nice property of demonstrating that supporters of the opposing party could be simultaneously uncracked and unpacked-within one particular plan than an array of alternatives.
See, e.g. , League of Women Voters Plaintiffs' Brief, 1:16CV1026 (Doc. 138) at 11-12. But this evidence, and any remedy, is based upon maps which were drafted in a completely nonpartisan fashion, and I do not find that action or that remedy to be constitutionally required or even appropriate. As Justice Scalia described in Vieth :
The Constitution clearly contemplates districting by political entities, see Article I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics. See Miller, supra , at 914, 115 S.Ct. 2475 ("[R]edistricting in most cases will implicate a political calculus in which various interests compete for recognition ..."); Shaw, supra , at 662, 113 S.Ct. 2816 (White, J., dissenting) ("[D]istricting inevitably is the expression of interest group politics ..."); Gaffney v. Cummings , 412 U.S. 735, 753, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) ("The reality is that districting inevitably has and is intended to have substantial political consequences").
Vieth , 541 U.S. at 285-86, 124 S.Ct. 1769.
Instead, I believe that only the state legislatures, through their power to draft congressional districts in the first instance, and Congress with its power under Article I, Section 4 of the United States Constitution, have the authority to remove political partisan considerations entirely from the redistricting process. "It is significant that the Framers provided a remedy for such practices in the Constitution. Article I, § 4, while leaving in state legislatures the initial power to draw districts for federal elections, permitted Congress to 'make or alter' those districts if it wished." Vieth , 541 U.S. at 275, 124 S.Ct. 1769. With respect to political or partisan considerations in the drawing of congressional districts, the Constitution provides the people of this State with the power to "seek relief from Congress, which can make or alter the regulations prescribed by the legislature. And the Constitution gives them another means of change. They can follow the lead of the reformers who won passage of the Seventeenth Amendment." Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n , --- U.S. ----, 135 S.Ct. 2652, 2692, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting). I therefore do not assign the same weight or consideration to Dr. Chen's maps as the majority has in its opinion, and further find the comparison of Dr. Chen's maps to the 2016 Plan of only limited relevance.
III. First Amendment
Assuming that partisan gerrymandering claims are justiciable under the First Amendment,[3] I find that the majority's *955 adopted test would in effect foreclose all partisan considerations in the redistricting process-a result I am unable to conclude that the First Amendment requires - and would allow redress for an injury that Plaintiffs have not proven rises to a constitutional level. Therefore, I respectfully dissent.
No one disputes that the First Amendment protects political expression and association. Citizens United v. Fed. Election Comm'n , 558 U.S. 310, 339-40, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) ; Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). But as another court aptly noted in rejecting plaintiffs' claim that the inability to elect a preferred candidate burdened their political expression, "[p]laintiffs are every bit as free under the new [redistricting] plan to run for office, express their political views, endorse and campaign for their favorite candidates, vote, or otherwise influence the political process through their expression." Radogno v. Ill. State Bd. of Elections , No. 1:11-CV-04884, 2011 WL 5025251, at *7 (N.D. Ill. Oct. 21, 2011) (second alteration in original) (quoting Kidd v. Cox , No. 1:06-CV-0997-BBM, 2006 WL 1341302, at *17 (N.D. Ga. May 16, 2006) ). As the Radogno court explained, "[i]t may very well be that Plaintiffs' ability to successfully elect their preferred candidate is burdened by the redistricting plan, but that has nothing to do with their First Amendment rights." Id. (citing Washington v. Finlay , 664 F.2d 913, 927-28 (4th Cir. 1981) ).
Plaintiffs are likewise free under the 2016 Plan to "field candidates for office, participate in campaigns, vote for their preferred candidate, or otherwise associate with others for the advancement of common political beliefs." Id. (quoting Kidd , 2006 WL 1341302, at *17 ). The fact that some Plaintiffs testified about difficulties involving voter outreach, fundraising, and candidate recruitment, (see, e.g. , Dep. of Elizabeth Evans 16:4-9, April 7, 2017, 1:16-CV-1026, Doc. No. 101-7; Dep. of John J. Quinn, III 39:1-3, April 10, 2017, 1:16-CV-1026, Doc. No. 101-22), fails to persuade me that the 2016 Plan objectively chilled the speech and associational rights of the citizens of North Carolina so as to prove a First Amendment violation.[4]
Justice Kennedy, suggesting in Vieth that the First Amendment may be an applicable vehicle for addressing partisan gerrymandering claims, proposed that such an analysis should ask "whether political classifications were used to burden a group's representational rights." Vieth , 541 U.S. at 314-15, 124 S.Ct. 1769 (Kennedy, J., concurring). The Vieth plurality rejected this proposal because "a First Amendment claim, if it were sustained, would *956 render unlawful all consideration of political affiliation in districting, just as it renders unlawful all consideration of political affiliation in hiring for non-policy-level government jobs." Id. at 294, 124 S.Ct. 1769 (plurality op.). Common Cause Plaintiffs essentially agree, arguing that strict scrutiny is triggered once a plaintiff shows that a redistricting body intended for a plan to discriminate against a certain set of voters. (Common Cause Br. at 5-8.) The majority adopts an intermediate scrutiny standard requiring the showing of a concrete burden to political speech or associational rights. Maj. Op. at 929. However, in practice, I find the result to be indistinguishable, for partisan consideration in a political process is an attempt to create some sort of political advantage for the supporters of a candidate or party. This advantage necessarily comes at the expense of or burden to the other.
As explained above, Congress has declined to expressly limit partisan gerrymandering by statute, see 2 U.S.C. § 2c, and the Court's cases accepting or tolerating some amount of partisan consideration are many, see, e.g., Cromartie , 526 U.S. at 551, 119 S.Ct. 1545 ; Miller , 515 U.S. at 914, 115 S.Ct. 2475 ; Gaffney , 412 U.S. at 753, 93 S.Ct. 2321 ; see also Harris , --- U.S. ----, 137 S.Ct. at 1488, 197 L.Ed.2d 837 (Alito, J., concurring in part and dissenting in part); Whitford , 218 F.Supp.3d at 934-35 (Griesbach, J., dissenting). It might be desirable for a host of policy reasons to remove partisan considerations from the redistricting process. But I am unable to conclude that the First Amendment requires it, or that Plaintiffs here have proven violations of their speech or associational rights under the First Amendment.
IV. Article I, Sections 2 and 4
I agree with the majority's conclusion that Plaintiffs have alleged and proven standing to challenge the 2016 Plan. Under Article I, Sections 2 and 4, I would again find standing on behalf of those voters in cracked districts who were not able to elect the candidate of their choice. Under this same theory, if such standing is ultimately found constitutionally proper as a matter of law by the Court, those voters unable to elect the candidate of their choice have sustained injury due to legislative control of their district's electoral result.
I join the majority and find that the 2016 Plan amounts to a successful attempt to dictate election outcomes. I join in the majority's opinion as to Article I, Sections 2 and 4 to the extent consistent with the discussion above. I differ slightly from the majority in that I do not find that the Elections Clause completely prohibits State legislatures from disfavoring a particular party. See Brown v. Sec'y of State of Fla. , 668 F.3d 1271, 1284 & n.10 (11th Cir. 2012) (rejecting the prohibition of all regulations influencing election outcomes and instead reading the cases as prohibiting States from attempting "to prevent or severely cripple the election of particular candidates").
"[T]he people should choose whom they please to govern them." U.S. Term Limits, Inc. v. Thornton , 514 U.S. 779, 783, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (quoting Powell v. McCormack , 395 U.S. 486, 547, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) ). In this case, the legislature, not the people, dictated the outcome when the districts were drawn, and Defendants have presented no specific facts to support a finding that the election results were due to anything other than the maps being drawn to reach a specific result. General suggestions of other factors possibly contributing to the election results such as fundraising disparities, voter turnout, the quality of the candidates, and unforeseen candidate circumstances, see, e.g. , Legislative Defs.'
*957 Post-Trial Br. 10-11, Nov. 6, 2017, ECF No. 115; Leg. Defs.' Proposed Findings of Fact and Conclusions of Law 67, Nov. 6, 2017, ECF No. 114, are insufficient to establish that something other than partisan consideration dictated the election results across the State.
V. Remedy
I concur with the majority's remedial action. I agree that the General Assembly generally is entitled to a second opportunity to draw a constitutional congressional districting plan. As noted in both the majority opinion and this opinion, the adjudication of partisan gerrymandering claims against a redistricting plan is a developing area of law, and the General Assembly generally should have the opportunity to remedy its plan under the standards set forth in the majority opinion.

In my opinion previously, see Common Cause v. Rucho , 279 F.Supp.3d 587, 692 (M.D.N.C. 2018) (Osteen, J., concurring in part and dissenting in part), vacated and remanded , --- U.S. ----, 138 S.Ct. 2679, --- L.Ed.2d ---- (June 25, 2018) (mem.), I expressed my concern over Equal Protection and First Amendment claims in this context. Justice Scalia, in Vieth , explained his opinion that these claims are not justiciable because of an inability to establish "judicially discernible and manageable standards." See Vieth , 541 U.S. at 280, 124 S.Ct. 1769. After a review of Gill , particularly in light of its pointed discussion of an "undifferentiated, generalized grievance about the conduct of government," Gill , 138 S.Ct. at 1931, quoting Lance v. Coffman , 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007), I remain concerned over the justiciability of Equal Protection and First Amendment claims of political gerrymandering. See Common Cause , 279 F.Supp.3d at 692-93. I am not sure there is a constitutional, and judicially manageable, standard for limiting partisan political consideration by a partisan legislative body in the discharge of its duties except by legislative action, see U.S. CONST. art. I, § 4, or by what I continue to see as an outside limit established by Article I, Sections 2 and 4 of the United States Constitution prohibiting a legislature from dictating election results. Nevertheless, we are bound to follow existing Supreme Court precedent.

In North Carolina, redistricting is conducted by the General Assembly, a partisan body, consistent with the Constitution. As Chief Justice Roberts explains:
[S]tates have "broad powers to determine the conditions under which the right of suffrage may be exercised." Carrington v. Rash , 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (internal quotation marks omitted); see also Arizona, ante , at 570 U.S., 1, 133 S.Ct. at 2257-2259. And "[e]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." Boyd v. Nebraska ex rel. Thayer , 143 U.S. 135, 161, 12 S.Ct. 375, 36 L.Ed. 103 (1892). Drawing lines for congressional districts is likewise "primarily the duty and responsibility of the State." Perry v. Perez , 565 U.S. 388, 392, 132 S.Ct. 934, 940, 181 L.Ed.2d 900 (2012) (per curiam) (internal quotation marks omitted).
Shelby Cty. v. Holder , 570 U.S. 529, 543, 133 S.Ct. 2612, 2623, 186 L.Ed.2d 651 (2013).

As we recognized, "the splintered opinions in Bandemer and Vieth stand for, at a minimum, [that] Fourteenth Amendment partisan gerrymandering claims are justiciable[.]"Common Cause , 240 F.Supp.3d at 387. But the justiciability (or nonjusticiability) of a claim under one legal theory does not necessitate the same result under another. See Baker v. Carr , 369 U.S. 186, 209-11, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Although "nothing in the Court's splintered opinions in Vieth rendered nonjusticiable Plaintiffs' First Amendment claims[,]" Common Cause , 240 F.Supp.3d at 389, the Court has not expressly ruled in this area, which remains unsettled at best.

It should also be noted that the "concept of a 'chilling effect' is associated with the doctrine of overbreadth, and describes the situation where persons whose expression is protected are deterred from exercising their rights by the existence of an overly broad statute regulating speech." Kidd , 2006 WL 1341302, at *18 n.12 (internal citation omitted); see also New York v. Ferber , 458 U.S. 747, 772 & n.27, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). While Plaintiffs and other citizens may feel a sense of disillusionment toward the political process due to the 2016 Plan, this differs from fear of enforcement due to an "overly broad statute regulating speech."