RICHARDSON, Circuit Judge, concurring in part and dissenting in part:
The plaintiffs ask this Court to invalidate the rescission of DACA, a seven-year-old program explained at its inception as an act of prosecutorial discretion. The Majority's opinion grants this request, reasoning that the Department of Homeland Security behaved in an arbitrary and capricious manner by giving what my good colleagues decide are faulty legal reasons for rescinding the discretionary policy.
I disagree with the premise that the Administrative Procedure Act permits this review of the Executive Branch's rescission of DACA. Enforcement discretion lies at the heart of executive power. The Executive may decide to prosecute, or not prosecute, an individual or a group so long as the reasons for that decision are constitutionally sound and the decision does not violate or abdicate the Executive's statutory duties. Here, the Executive's proper exercise of that discretion to rescind DACA is judicially unreviewable under the Administrative Procedure Act, regardless of one's view of the policy questions underlying DACA. To hold otherwise permits the Judicial Branch to invade the province of the Executive and impair the carefully constructed separation of powers laid out in our Constitution.
I. Background
The Secretary of Homeland Security is charged by statute with enforcing the nation's immigration laws. See 8 U.S.C. § 1103(a) ; 6 U.S.C. § 202(5). Among those responsibilities is removing individuals subject to removal under federal law. See Arizona v. United States , 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). "A principal feature of the removal system is the broad discretion exercised by immigration officials." Id . At each stage of the process-from investigation to execution of a removal order-the Secretary has the discretion to pursue removal or forbear doing so. Reno v. Am.-Arab Anti-Discrimination Comm. , 525 U.S. 471, 483, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).
The Secretary has used this discretion to prioritize the removal of certain categories of aliens and deprioritize others. See, e.g. , Memorandum from Doris Meissner, Commissioner, Dep't of Justice, Immigration & Naturalization Service, "Exercising Prosecutorial Discretion" 7-9 (Nov. 17, 2000) (deprioritizing the removal of aliens who, for instance, resided in the United States for a long time, had little to no criminal history, and had greater ties to the United States than another country); Memorandum from John Morton, Director, Dep't of Homeland Sec., Immigration & Customs Enforcement, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" 2 (June 17, 2011) (deprioritizing the removal of veterans, minors, elderly individuals, pregnant women, and various other groups). On top of these general, department-wide enforcement policies, individual agents have been empowered to exercise enforcement discretion based on specific circumstances. See, e.g. , Meissner Memorandum at 1-2. Just as a highway patrolman has discretion whether to pull over a given driver (and even after pulling someone over, whether to give that person a ticket), immigration *708 agents can weigh individual and country-specific humanitarian circumstances when deciding whether to exercise their prosecutorial discretion. See Morton Memorandum at 4.
Relying on this broad enforcement discretion to set enforcement priorities and to guide agents in rendering their individualized enforcement decisions, the Secretary of Homeland Security established the DACA program. Memorandum from Janet Napolitano, Secretary, Dep't of Homeland Sec., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012). DACA authorized agents to grant deferred action[1] to certain people brought illegally to the United States as children. Under DACA, aliens who applied and satisfied certain gateway criteria were "granted" or "denied" deferred action, ostensibly on an individualized, case-by-case basis. Id. Even when granted, deferred action could be revoked unilaterally by the Department. See AAADC , 525 U.S. at 484-85, 119 S.Ct. 936. The DACA memorandum stated expressly that it conferred upon recipients of deferred action "no substantive right, immigration status or pathway to citizenship." Napolitano Memorandum at 3.
Two years later, the Secretary expanded DACA by loosening some restrictions and extending the period of deferred action from two years to three. Memorandum from Jeh Johnson, Secretary, Dep't of Homeland Sec., "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (Nov. 20, 2014). In the same action, the Secretary also created a new enforcement policy, known as "DAPA," extending "deferred action, on a case-by-case basis," to parents of American citizens and lawful permanent residents. Id. at 4.
Led by Texas, a coalition of states challenged this new policy in federal court, arguing that DAPA (and the DACA expansion) violated the Administrative Procedure Act as well as the President's Article II duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. The district court preliminarily enjoined DAPA, holding that the Department had "legislated a substantive rule without complying with the procedural requirements under the" APA. Texas v. United States , 86 F.Supp.3d 591, 677 (S.D. Tex. 2015). The Fifth Circuit affirmed the district court, finding that the Department had promulgated DAPA in violation of the APA and that it was "manifestly contrary" to the Immigration and Nationality Act ("INA"). Texas v. United States , 809 F.3d 134, 182 (5th Cir. 2015).[2]
The Supreme Court granted certiorari and directed the parties to brief not only the issues decided by the Fifth Circuit, but also whether "the Guidance violates the Take Care Clause of the Constitution, Art. II, § 3." United States v. Texas , --- U.S. ----, 136 S.Ct. 906, 193 L.Ed.2d 788 (2016). But after oral argument, the Fifth Circuit decision was summarily affirmed by an equally divided Court. United States v. Texas , --- U.S. ----, 136 S.Ct. 2271, 2272, 195 L.Ed.2d 638 (2016).
*709 In response, the Secretary rescinded the enjoined DAPA program and DACA expansion. Memorandum from John Kelly, Secretary, Dep't of Homeland Sec., "Rescission of November 20, 2014 Memorandum" (June 15, 2017). And several months later, after Texas threatened to challenge the original DACA policy, the Acting Secretary similarly rescinded DACA. Memorandum from Elaine Duke, Acting Secretary, Dep't of Homeland Sec., "Rescission of the June 15, 2012 Memorandum" (Sept. 5, 2017).
In justifying her decision to rescind DACA, the Acting Secretary referred to the Supreme Court and Fifth Circuit decisions in the DAPA litigation. She also relied on a letter from the Attorney General that asserted that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Id. at 3-4. The Acting Secretary nonetheless ordered that DACA be wound down in stages over a six-month period. Id.
II. Administrative Procedure Act Review
The plaintiffs primarily contend that the rescission of DACA violates the APA. Because I find that immigration enforcement decisions are committed to the discretion of the Department, I part with my colleagues and conclude that the rescission of DACA is judicially unreviewable under the APA.[3]
A. Discretionary enforcement decisions are presumptively unreviewable.
The APA regulates the decisionmaking process of federal agencies. As such, the statute provides for the judicial review of a "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Even so, the statute does not permit review of agency action that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This provision applies to a variety of agency decisions that are unsuitable for judicial review. See Lincoln v. Vigil , 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) ; Citizens to Pres. Overton Park, Inc. v. Volpe , 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). One essential category of decisions "generally committed to an agency's absolute discretion" consists of enforcement decisions, both in the civil and criminal arenas. Heckler v. Chaney , 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).
Discretion in prosecutorial enforcement is deeply rooted in the Constitution's separation of powers. See, e.g. , In re Aiken County , 725 F.3d 255, 264 (D.C. Cir. 2013) ; Saikrishna Prakash, The Chief Prosecutor , 73 GEO. WASH. L. REV. 521, 537-63 (2005). Indeed, the division of labor with respect to enforcement is among the most critical protections the Constitution affords: The Executive Branch decides whether and when to begin enforcement actions while the Judicial Branch adjudicates the government's claims. This division reflects the Framers' recognition that, "in the long term, structural protections against abuse of power were critical to preserving liberty." Bowsher v. Synar , 478 U.S. 714, 730, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).
Encroachment by the judiciary into enforcement decisions upsets this constitutional balance. If judges could decide which cases to prosecute, that would combine the role of prosecutor and judge in one branch of government, seriously risking *710 individual liberty. See In re United States , 345 F.3d 450, 454 (7th Cir. 2003) ; see also 1 BARON DE MONTESQUIEU, THE SPIRIT OF LAWS 154 (Thomas Nugent trans., 6th ed. 1792) ("[T]here is no liberty, if the judiciary power be not separated from the legislative and executive."). And if the judiciary could decide which meritorious cases not to prosecute, that would improperly divest the President, who unlike judges is elected by the people, of the executive authority that the Constitution affords to protect public safety and enhance public welfare. Thus, in "the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' " United States v. Armstrong , 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting Bordenkircher v. Hayes , 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) ); see also United States v. Nixon , 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). The judiciary's role is to protect individuals by properly adjudicating the charges against them-for example, by dismissing meritless enforcement actions after they are filed. It is normally neither appropriate nor necessary for judges to involve themselves in the decision to bring, or not to bring, enforcement actions.
Though perhaps more often discussed in the criminal context, this broad enforcement discretion also encompasses civil enforcement decisions. See Speed Mining, Inc. v. Federal Mine Safety , 528 F.3d 310, 317 (4th Cir. 2008) ; see also Southern Ry. Co. v. Seaboard Allied Milling Corp. , 442 U.S. 444, 448, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979). Indeed, the Supreme Court has recognized that the concerns that counsel against reviewing criminal enforcement decisions are even stronger in the context of immigration removal decisions. AAADC , 525 U.S. at 490, 119 S.Ct. 936 (noting that the "systemic costs" of judicial supervision of enforcement decisions are "greatly magnified in the deportation context"); see also Mathews v. Diaz , 426 U.S. 67, 81-82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).
The nature of civil enforcement discretion led the Supreme Court in Heckler v. Chaney to hold that an agency's nonenforcement decision was presumptively unreviewable under the APA. In that case, the Food and Drug Administration refused to take civil enforcement action against a class of drug manufacturers and others who produced and distributed drugs used by states to perform executions. The FDA explained its decision not to institute any enforcement action as a product of concerns that it lacked jurisdiction to address the use of drugs in such a way. Yet even if it could, the FDA noted that it would decline to exercise jurisdiction over those manufacturers under its inherent enforcement discretion. The Court found the decision to be presumptively unreviewable under the APA because agency enforcement decisions "involve[ ] a complicated balancing of a number of factors," like allocating resources and prioritizing policies, that "are peculiarly within [the FDA's] expertise" and are thus generally unsuitable for judicial review. Chaney , 470 U.S. at 831, 105 S.Ct. 1649 ; cf. Wayte v. United States , 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (noting that the factors that underlie prosecution decisions are of the type that courts are not competent to evaluate).
While civil enforcement decisions are presumptively unreviewable, Congress can overcome that presumption by "circumscrib[ing]
*711 agency enforcement discretion" through a substantive statute. Chaney , 470 U.S. at 834, 105 S.Ct. 1649 ; see also id. at 830, 105 S.Ct. 1649 (noting that judicial review is unavailable under the APA if the statute provides "no judicially manageable standards ... for judging how and when an agency should exercise its discretion"). In this way, Congress retains the ability to restrict the Executive's enforcement discretion. In Chaney , to decide whether the FDA was so restricted, the Court examined the relevant statutory provisions and determined that the statutes provided no dictate about when enforcement discretion must be exercised. Since the FDA's enforcement discretion was both statutorily authorized and unconstrained, the Court held that the enforcement decision was not subject to APA review.
Chaney also noted, without deciding, two other possible bases for judicial review of civil nonenforcement decisions: if (1) the decision was based "solely on belief that [the agency] lacked jurisdiction"; or (2) an agency expressly adopted a "general policy that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4, 105 S.Ct. 1649. The Supreme Court later rejected the first possibility in I.C.C. v. Brotherhood of Locomotive Engineers , finding that an agency's reliance on a "reviewable reason" for an otherwise unreviewable discretionary decision did not transform the decision into one subject to APA review. 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987). The second, which might be thought related to the Take Care Clause, U.S. CONST. art II, § 3, remains a narrow exception theoretically permitting judicial review of agency enforcement decisions in some rare cases.
B. The rescission of DACA is not reviewable.
The decision to rescind DACA is precisely the sort of enforcement decision that is "traditionally ... 'committed to agency discretion' " and not reviewable by the courts. Chaney , 470 U.S. at 832, 105 S.Ct. 1649. None of the recognized exceptions to that limitation apply, and so the rescission of DACA is not reviewable under the APA.
The Supreme Court has recognized that a "principal feature of the removal system is the broad discretion exercised by immigration officials." Arizona v. United States , 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Indeed, executive decisions about immigration enforcement are even further beyond the capacity of judicial review than criminal enforcement decisions, which are otherwise thought to represent the peak of executive discretion. AAADC , 525 U.S. at 489-90, 119 S.Ct. 936.
As a result, with or without DACA, government agents have discretion to grant deferred action in individual cases. Id. at 483-84, 484 n.8, 119 S.Ct. 936. At least by its own terms, DACA did not eliminate the individualized discretion over enforcement decisions: it created procedural and substantive scaffolding to guide that discretion. See Napolitano Memorandum at 2. Rescinding DACA took away the scaffolding but left the underlying core-individualized discretion-untouched. Thus, insofar as DACA is merely a programmatic enforcement decision, so is its rescission, and both are unreviewable.
The best argument in favor of reviewability is that DACA itself was something other than an enforcement decision. Once granted, deferred action makes recipients eligible for benefits such as the ability to work legally in the country. These are subsidiary or collateral benefits that arise from other legal provisions not challenged here. See 8 U.S.C. § 1324a(h)(3) (" '[U]nauthorized alien' means ... that the alien is not at that time ... authorized to be so *712 employed by this chapter or by the Attorney General."); see also 8 C.F.R. § 274a.12(c)(14). Yet the Fifth Circuit found DAPA reviewable because it "would affirmatively confer 'lawful presence' and associated benefits." Texas , 809 F.3d at 166. Moreover, some have argued that DACA only masquerades as a program involving individualized discretion and in fact amounts to an entitlement of benefits for the class of aliens who meet the program's threshold criteria. Again, the Fifth Circuit reached a similar conclusion about DAPA. See id. at 171-76.
But neither side presses such an argument in this case, and for good reason. The government does not because it claims DACA's rescission is unreviewable. Nor do the plaintiffs, because if they did, their case would be much harder on the merits. DACA relied on identified individualized enforcement as a necessary predicate for the program's existence. See The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. ----, 2014 WL 10788677, at *13 n.8 (Nov. 19, 2014). If that predicate was false, then DACA was almost surely procedurally and substantively invalid. And that would mean one of the Department's proffered explanations for rescinding DACA-that it was likely unlawful-was valid. Unsurprisingly then, the plaintiffs do not rely on this point, giving us no occasion to consider whether DACA might be anything other than what it claimed to be: a program for a specific exercise of prosecutorial discretion.
No other exception makes the plaintiffs' APA claims reviewable. In particular, nothing in the INA overcomes Chaney 's presumption of unreviewability. That presumption "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Chaney , 470 U.S. at 832-33, 105 S.Ct. 1649 ; see also Webster v. Doe , 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (" § 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based[.]"). Nothing in the INA cabins the government's broad immigration enforcement discretion. To the contrary, the INA expansively vests the Secretary of Homeland Security with authority for "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5) ; see also 8 U.S.C. § 1103(a)(1). Our nation's immigration laws do not limit the Secretary's authority to enforce those laws by removing illegal aliens. As a result, the INA does not overcome the presumptive unreviewability of the DACA rescission.
C. The generalized nature of DACA does not render its rescission reviewable.
The Majority adopts a new exception, contending that general enforcement policies, unlike individual enforcement decisions, are reviewable. While this exception has some support in out-of-circuit precedent, I would reject it.
This exception is grounded in dictum from Chaney , which left open the possibility of review when an agency adopts a "general policy that is so extreme as to amount to an abdication of its statutory responsibilities ." Chaney , 470 U.S. at 833 n.4, 105 S.Ct. 1649 (emphasis added). That is, a general policy that licensed illegal conduct across the board or that categorically excluded a class of individuals from complying with the law might well be reviewable. But nobody here is arguing that the rescission of DACA should be so characterized. Nor could they. A return to the pre-DACA regime would increase the Department's *713 enforcement of the immigration laws, not abandon it.
A few cases from the D.C. Circuit seem to stretch Chaney 's dictum to encompass any "general enforcement policy," as opposed to a "single-shot nonenforcement decision." E.g. , OSG Bulk Ships, Inc. v. United States , 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting Crowley Caribbean Transp., Inc. v. Pena , 37 F.3d 671, 676 (D.C. Cir. 1994) ). The facts of these cases suggest this principle may be narrower than it appears at first blush. For example, in some cases, the agency's policy was promulgated as a binding regulation after notice-and-comment rulemaking, which would of course be much more amenable to judicial review than a program like DACA, announced by an informal memorandum. See National Wildlife Federation v. EPA , 980 F.2d 765 (D.C. Cir. 1992). It also appears that these cases did not involve programs that, like DACA, were expressly predicated on the agency's exercise of individualized discretion.
To the extent that the D.C. Circuit has embraced the broad principle that any "general enforcement policy" is judicially reviewable, that principle simply cannot be reconciled with Chaney . There, the Supreme Court held unreviewable the FDA's categorical decision not to take enforcement action against a class of actors (drug manufacturers, prison administrators, and others in the drug distribution chain). 470 U.S. at 824-25, 837-38, 105 S.Ct. 1649. The fact that the decision was made by the FDA Commissioner made no difference. See id. at 824, 105 S.Ct. 1649. The D.C. Circuit's decisions in this area do not even attempt to explain how this sweeping principle can be reconciled with the facts of Chaney . See, e.g. , Crowley , 37 F.3d at 675-77. Indeed, they often have no reasoning, simply reciting language (often dicta) from earlier circuit cases.
Such a broad exception for "generalized enforcement policies" would also unduly trammel the Executive Branch in carrying out its duties. The head of an agency has every right to exercise enforcement discretion. Standardizing (i.e. , generalizing) how agents use their prosecutorial discretion does not alter its character. Whether the Secretary exercises her discretion over an individual case or provides guidance for how discretion should be applied in a class of cases, the decision is unreviewable as one "committed to agency discretion by law." Under the plaintiffs' view, a line agent's decision not to remove a cancer-stricken alien would be unreviewable, but a front-office policy directing line agents to consider whether an alien is terminally ill would be reviewable. That distinction is untenable. See Perales v. Casillas , 903 F.2d 1043, 1048 (5th Cir. 1990) (holding that § 701(a)(2) precluded review of a categorical refusal by a district office to grant work authorization and pre-hearing voluntary departure to a certain class of eligible aliens over a three-year period).
As anyone who has exercised enforcement discretion knows, supervisory control over that discretion is necessary to avoid arbitrariness and ensure consistency. Supervision through generalized guidance that directs the exercise of enforcement discretion cannot transform the enforcement directive into a reviewable action. To find that discretionary enforcement decisions are unreviewable only when inferior officers exercise single-shot enforcement decisions also brushes aside the separation of powers that the Constitution lays out. The President is empowered by Article II to "take Care that the Laws be faithfully executed," and thus may hire officers to assist in these duties. But the constitutional responsibility remains firmly at the President's feet, and therefore, the President remains responsible for his subordinates' exercise of executive power.
*714 Free Enter. Fund v. Pub. Co. Accounting Oversight Bd. , 561 U.S. 477, 484, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) ("The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them.").[4]
DACA-at least on its face-was just such an unreviewable exercise of supervisory enforcement discretion. It was issued by the Secretary and instructed her subordinates when and how to exercise their discretion, emphasizing that "requests for relief pursuant to this memorandum are to be decided on a case by case basis." Napolitano Memorandum at 2. Such general decisions on enforcement policy, no less than the individual decisions that flow from them, cannot be reviewed by the courts without intruding on the prerogatives of the Executive Branch. And that is necessarily true of DACA's rescission, which merely removed one avenue for exercising individualized discretion. As a result, the rescission is an even less viable candidate for judicial review than is the promulgation of DACA.
D. The Acting Secretary's use of legal reasoning in rescinding DACA does not render her decision reviewable.
The plaintiffs also argue that the Acting Secretary's use of legal reasoning in deciding to rescind DACA makes the decision subject to judicial review. In their view, courts can evaluate legal determinations.
This argument is foreclosed by Supreme Court precedent. The Supreme Court has matter-of-factly explained that there is no "principle that if the agency gives a reviewable reason for otherwise unreviewable action, the action becomes reviewable." BLE , 482 U.S. at 283, 107 S.Ct. 2360 (internal quotation marks omitted). Enforcement decisions are often intertwined with legal reasoning, most obviously "the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction." Id. The Court found it "entirely clear" that this "reviewable" proposition cannot render the prosecutor's "refusal to prosecute" subject to judicial review. Id.
Efforts to distinguish BLE factually cannot avoid its holding. In BLE , an agency had refused to reconsider a prior decision on the ground of material error. The Court found that such denials of reconsideration have "traditionally been 'committed to agency discretion by law.' " Id. at 282, 107 S.Ct. 2360 (quoting Chaney , 470 U.S. at 832, 105 S.Ct. 1649 ). As here, the plaintiffs argued that the particular decision before the Court should be reviewable anyway, because the agency had based its refusal on a reviewable issue of law. The Court *715 disagreed and held, as noted, that an unreviewable decision does not become reviewable by virtue of the reasons provided. Id. at 280-81, 107 S.Ct. 2360. That holding is plainly not limited to cases involving requests for reconsideration. After BLE , the scope of permissible judicial review must be determined by the type of agency action at issue and not the agency's reasons for acting.
Just as in BLE , there is a nonsensical implication in the plaintiffs' position: that the Executive's discretion is more constrained when it gives a "reviewable" reason for its actions than when it gives no reason at all. If the Acting Secretary was wrong about the likely illegality of DACA,[5] then this might mean that she had provided no lawful reason for the rescission. But in the context of the Executive's enforcement discretion, this is perfectly appropriate. The Executive need not explain why it makes particular enforcement and non-enforcement decisions. The Judicial Branch cannot bootstrap review of decisions committed to the discretion of the other branches simply because the reasons provided are of a type that judges consider themselves competent to evaluate.
In any event, the Acting Secretary's rescission memorandum was not a mere statement on the legality of DACA. Instead, the memorandum considered various court rulings as well as the Attorney General's letter before concluding that the "DACA program should be terminated." Duke Memorandum at 4 (emphasis added). She did not say that DACA must be terminated or that she lacked the legal authority to enforce DACA or a DACA-like program. And in declaring the rescission of DACA after a six-month wind-down period, the Acting Secretary invoked her statutory authority to "establish[ ] national immigration policies and priorities." Id . The Acting Secretary's legal analysis was only one aspect of her reasoning for rescinding DACA, and, of course, a prosecutor may consider beliefs about the law when setting enforcement policy, see BLE , 482 U.S. at 283, 107 S.Ct. 2360.
For these reasons, I conclude that the plaintiffs' APA claims are not reviewable and would dismiss them.
III. Constitutional Claims
Because they rule for the plaintiffs under the APA, my colleagues in the Majority decline to address the plaintiffs' constitutional claims. But because I find the plaintiffs' APA claims to be unreviewable, I must briefly address their claims that the rescission of DACA also violates the Fifth Amendment's guarantees of Due Process and Equal Protection.[6] I have little trouble concluding that it did not.
A. Due Process
The plaintiffs' due process claim fails to articulate a constitutionally protected life, *716 liberty, or property interest impacted by the rescission of DACA. And without a protected interest, there can be no unconstitutional deprivation.
The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V, cl. 4. A plaintiff raising a due process claim must thus begin by identifying a relevant liberty or property interest. Wooten v. Clifton Forge Sch. Bd. , 655 F.2d 552, 554 (4th Cir. 1981). While a government benefit may create such an interest, "a person clearly must have more than an abstract need or desire for [the benefit] .... He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colleges v. Roth , 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
While the plaintiffs argue that DACA created such a claim of entitlement, it did not. On its face, DACA explicitly conferred no protected property or liberty interest, making deferred action putatively available on a discretionary case-by-case basis for two-year periods that could be terminated at any time at the Secretary's discretion. See Napolitano Memorandum at 2-3; AAADC , 525 U.S. at 484-85, 119 S.Ct. 936. The memorandum itself acknowledged that such rights could be conferred only by "Congress, acting through its legislative authority." Id. at 3; see also Smith v. Ashcroft , 295 F.3d 425, 429 (4th Cir. 2002) (noting that for a statute to create a liberty or property interest, "it must confer more than a mere expectation (even one supported by consistent government practice) of a benefit"). Having failed to show a protected interest, the plaintiffs' due process claim fails.
The plaintiffs may have serious concerns about our nation's immigration laws and the Department's policy of enforcing those laws. But an understandable policy concern is not a legally cognizable right. The rescission of DACA simply does not generate a due process claim.
B. Equal Protection
The plaintiffs also argue that the rescission of DACA violates the Fifth Amendment's guarantee of equal protection by targeting a class of aliens for removal based on their race and national origin. See Bolling v. Sharpe , 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). They have failed to plausibly allege such a claim.
As both parties acknowledge, DACA is an enforcement policy, and so the plaintiffs' challenge to its rescission is necessarily a selective-prosecution claim.[7] In an ordinary selective-prosecution case, the plaintiffs would have to show that the government's conduct "had a discriminatory effect and that it was motivated by a discriminatory purpose." Wayte v. United States , 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) ; see also Armstrong , 517 U.S. at 465, 116 S.Ct. 1480 (noting that "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification' ") (emphasis added) (quoting *717 Oyler v. Boles , 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962) ). There is also a "presumption that a prosecutor has acted lawfully," which can be displaced only by "clear evidence." AAADC , 525 U.S. at 489, 119 S.Ct. 936. But the plaintiffs' burden is even higher in this case, because the rescission of DACA only applies to aliens who are in this country illegally. Such an alien "has no constitutional right to assert selective enforcement as a defense against his deportation," with a possible exception for "rare" cases of particularly "outrageous" discrimination. Id. at 488, 491, 119 S.Ct. 936.
Here, both DACA and its rescission are, on their face, neutral policies. Logically, the presumption of lawfulness that applies in individual selective-prosecution cases is at least as strong when applied to neutral policies promulgated by senior Executive Branch officials. And the plaintiffs must allege facts that, if true, plausibly suggest that this presumption can be overcome and replaced with an inference of outrageous discrimination.
The plaintiffs have alleged two sets of facts to support their claim of discrimination. First, they argue that since 93% of DACA recipients are Latino, the program's rescission had a disparate impact. A selective-prosecution claim normally requires differential treatment of "similarly situated individuals of a different race." Armstrong , 517 U.S. at 465, 116 S.Ct. 1480. Yet who is "similarly situated" to DACA recipients except other DACA recipients? Setting aside the closely related and now-rescinded DAPA program, DACA stands alone as a unique exercise of Executive authority. While there are other deferred action programs (many of which are statutory), none resembles DACA. And the Department rescinded DACA for all recipients, not just for those of a particular ethnicity or nationality.
Second, the plaintiffs rely on presidential campaign tweets, which they claim show invidious animus. But the plaintiffs must create a plausible inference that the same animus allegedly underlying these statements also motivated the Attorney General and the Acting Secretary to take the official government actions at issue. Their complaint simply lacks the connective tissue required to draw that inference. There is also an "obvious alternative explanation" for these officials' actions. Ashcroft v. Iqbal , 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). As the record shows, DACA has long been politically controversial. It "should come as no surprise," id. , that well-known policy differences would lead cabinet officials in a new administration to change a controversial government policy. See Memorandum from John Kelly, Secretary, Dep't of Homeland Sec., "Enforcement of the Immigration Laws to Serve the National Interest" 2 (Feb. 20, 2017) (setting out the Administration's new enforcement policies and stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement"). Changes in government policy are perfectly lawful, and for a selective-prosecution claim, we must presume that the Attorney General and the Acting Secretary were motivated by such a lawful purpose. AAADC , 525 U.S. at 489, 119 S.Ct. 936. The plaintiffs allege no facts plausibly displacing that presumption.
In short, the plaintiffs have presented no evidence that racial motivations played any part in either the former Attorney General's advice or the former Acting Secretary's decision to rescind DACA. Therefore, I would dismiss the equal protection claim.
IV. Information-Sharing Policy
The Majority is correct that the plaintiffs' estoppel claim against the Department *718 is baseless. The availability of equitable estoppel against the government is controversial under any circumstances. See Office of Pers. Mgmt. v. Richmond , 496 U.S. 414, 419-21, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). The issue remains unresolved by the Supreme Court. See id. at 423, 110 S.Ct. 2465. And we have recognized that if such a doctrine is ever justified in this context, there must be "affirmative misconduct by government agents." Dawkins v. Witt , 318 F.3d 606, 611 (4th Cir. 2003) (citing INS v. Hibi , 414 U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) ).
In any case, the mere fact that the Department explicitly told applicants that its information-sharing policy "may be modified, superseded, or rescinded at any time" and that the policy "may not be relied upon to create any right or benefit," J.A. 1004, is enough to end our analysis. There was nothing for the plaintiffs to rely on for the proposition that their information was immune from disclosure.
Additionally, even if the doctrine of estoppel applied here, that would not justify the district court's nationwide injunction. See Gill v. Whitford , --- U.S. ----, 138 S.Ct. 1916, 1930-31, 1934, 201 L.Ed.2d 313 (2018) ; Virginia Society for Human Life, Inc. v. FEC , 263 F.3d 379, 394 (4th Cir. 2001) (abrogated on other grounds). This potent judicial tool was largely unheard-of until the mid-twentieth century. Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction , 131 HARV. L. REV. 417, 428 (2017). These broad injunctions pose many drawbacks that can quickly outweigh their benefits, particularly when they are overused (and overused repeatedly). Among other things, such injunctions sharpen plaintiffs' incentives to forum-shop while inhibiting the proper ventilation of difficult legal issues by deterring other lower courts from grappling with them. See id. at 460-61. Under our decentralized and multifaceted judicial system, judges must scrutinize the scope of the injunctive remedies they fashion. Even assuming a nationwide injunction could be appropriate in some case, an injunction that is limited to the plaintiffs should generally suffice.
* * *
We in the Judicial Branch have a narrowly circumscribed role. It is not our place to second-guess the wisdom of the discretionary decisions made by the other Branches. The rescission of DACA was a controversial and contentious decision, but one that was committed to the Executive Branch. For this reason, I respectfully dissent.

"Deferred action" means "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14).

In finding DAPA subject to review under the APA, the Fifth Circuit held that deferred action "is much more than nonenforcement." Texas , 809 F.3d at 166. The court reasoned that since recipients are conferred "lawful presence" and may receive associated benefits such as driver's licenses and unemployment insurance, deferred action was not an exercise of enforcement discretion. Id. at 168, 168 n.108.

The plaintiffs' constitutional claims are, of course, reviewable, and I address them separately below.

The supervisory use of prosecutorial discretion is not a novel phenomenon. See, e.g. , Treasury Department Circular to the Supervisors of the Revenue (Sept. 30, 1791), in 9 Papers of Alexander Hamilton 248-49 (Harold C. Syrett ed., 1965) (advising Treasury officials that "a great relaxation appears unavoidable" in enforcing provisions for seizing spirits without required certificates); Ruth Wedgewood, The Revolutionary Martyrdom of Jonathan Robbins , 100 Yale L.J. 229, 278, 339-53 (1990) (describing President Adams's decision to direct the federal prosecutor to enter a nolle prosequi for an allegedly mutinous sailor and describing then-Representative John Marshall's floor speech defending the Executive's prosecutorial discretion, see 10 Annals of Cong. , 6th Cong. 1st Sess. 614-17 (Mar. 7, 1800)); David P. Currie, The Constitution in Congress, The Jeffersonians : 1801-1829, at 5-6 (2001) (noting President Jefferson's "decision to pardon two individuals who had been convicted under the Sedition Act and to quash the pending prosecution of a third"); Letter from Thomas Jefferson to William Duane (May 23, 1801), in 8 The Writings of Thomas Jefferson 54, 55 (Paul Leicester Ford ed., 1897) (explaining that whenever President Jefferson should be met with a prosecution under the Sedition law he would treat it as a nullity and order a nolle prosequi ).

Evaluating the actual legality of DACA requires considering whether and how a court may adjudicate an alleged violation of the Take Care Clause. See Kendall v. United States ex rel. Stokes , 37 U.S. (12 Pet.) 524, 613, 9 L.Ed. 1181 (1838). But it also requires addressing the distinct question of whether and how one presidential administration may determine that a previous administration's policy was inconsistent with the constitutional obligation to take care that the nation's immigration laws be faithfully executed. Cf. Letter from President George Washington to Sec'y Alexander Hamilton, U.S. Dep't of the Treasury (Sept. 7, 1792) in 32 Writings of George Washington 144 (John C. Fitzpatrick ed., 1939) (writing in 1792 about enforcing unpopular tax laws, President Washington explained that it was his "duty to see the Laws executed: to permit them to be trampled upon with impunity would be repugnant to it").

Of course, courts may review the exercise of enforcement discretion for compliance with the Constitution. See Armstrong , 517 U.S. at 464, 116 S.Ct. 1480.

The plaintiffs assert that they are not claiming selective prosecution "but instead that the Government violated the Equal Protection Clause by rescinding the DACA program in order to target a class defined by race and national origin." Appellants' Response Brief at 30. This attempted rewording makes no difference. The rescission of DACA reset the agency's enforcement policies to no longer channel the exercise of enforcement discretion in a certain way. As the plaintiffs cannot dispute that the government has the statutory authority to enforce the immigration laws against them, any equal protection claim in this context must necessarily be a selective-prosecution claim.